(No. 25384.—

LEONORE G. NONNAST *et al.* Appellees, *vs.* THE NORTHERN TRUST COMPANY, Appellant.

*Opinion filed June 14, 1940—Rehearing denied October 9, 1940.*

WILSON, J., specially concurring.
SHAW, J., dissenting.

WARREN H. ORR, VERNON R. LOUCKS, and TENNEY, HARDING, SHERMAN & ROGERS, (HENRY F. TENNEY, CHARLES O. LOUCKS, and WILLIAM W. MILLER, of counsel,) for appellant.

STEARNS & JONES, (MALCOLM McKERCHAR, THURSTON R. LUNDEBERG, ROBERT V. JONES, LLOYD M. McBRIDE, and EDWARD H. BAKER, JR., of counsel,) for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Louis F. Nonnast died testate May 17, 1930. He had manufactured furniture successfully for many years and had acquired considerable wealth. In 1920, he incorporated his business as Louis F. Nonnast Sons, Inc., and turned the management over to his two sons, Harry, since deceased, and Emory Nonnast. He held ninety-five per cent of the stock and owned the building occupied, in part, by the factory. There were two other tenants, and the real estate was mortgaged for $150,000. The sons operated the business at a loss, so, in 1925, Nonnast resumed the manage-

ment. Over a period of years he advanced $268,419.66, in cash, to the corporation. In February, 1930, he suffered a cerebral hemorrhage and was paralyzed. On March 1, 1930, the son Emory Nonnast, filed in the probate court of Cook county a petition to have the father adjudged incompetent, and the Northern Trust Company appointed conservator. On March 6, 1930, a jury found Nonnast was a "distracted person," and on the same day letters of conservatorship were issued to the trust company. Representatives of the trust company called on Louis F. Nonnast that day for the purpose, so they state, of determining the extent and condition of his estate, and his wishes with respect thereto. Since he could not talk, the discussion, according to the witnesses, was carried on by Nonnast nodding his head, indicating "yes" or "no" to questions. Later, further calls were made by representatives of the trust company.

On March 13, 1930, the probate court having authorized it, the conservator hired Thulin & Company to make an audit of its ward's estate and of the furniture company. This audit showed the net estate of Louis F. Nonnast was $358,512.71, but events showed this was greatly exaggerated. The furniture company owed Nonnast $288,713.31 as of May 31, 1930, including interest; in the audit of the ward's estate this debt was shown as of March 15, 1930, and was then $282,948.81. This was estimated at twenty-five per cent of its face value, and the equity in the building at $150,000. When the mortgage was later foreclosed this equity was apparently worthless. The balance sheet of the furniture company as of March 15, 1930, showed a deficit of $265,914.40, but the audit disclosed that the company's condition was worse than shown by the balance sheet, since the latter included large sums for good-will and uncollectible accounts receivable, and over-valued the inventory and machinery. In spite of the fact that the furniture company was a corporation, the trust company under-

took to run the business with the funds of its ward. On March 13, 1930, without notice to any one, the conservator filed its petition in the probate court alleging that the furniture company had an inventory of $235,000, consisting almost entirely of furniture in process of manufacture, and requested an order to lend $17,500 of·the funds of its incompetent to the furniture company. On that day the court granted this petition. The conservator sold its ward's securities, and advanced to the furniture company $15,200 before Nonnast died, and $4800 more after his death, making a total of $20,000 which was never repaid. On October 8, 1930, Louis F. Nonnast's will was proved and admitted to record and letters testamentary were issued to the Northern Trust Company, as executor. This will gave no power to the executor to lend money to any one. Nevertheless, on November 26, 1930, the trust company, as executor, obtained another order from the probate court, again without notice, and advanced an additional $6500 to the furniture company which has not been repaid.

On July 2, 1930, the Northern Trust Company, as conservator, filed a petition in the probate court representing that Louis F. Nonnast was liable on a guaranty of certain trade acceptances of the Grand Rapids Furniture Company which had been discounted with the Security Bank of Chicago, and requested authority to pay that bank. An order was entered granting this petition. The record fails to show that there were any such trade acceptances discounted at the Security Bank. Instead, that bank had three notes of Louis F. Nonnast Sons, Inc., and officers of the bank stated that Nonnast had guaranteed their payment in writing. The written guaranty was not produced in the circuit court, and the officers of the Security Bank testified that this instrument could not be found after the hearing in the probate court. No claim on these notes was ever filed by the bank in either estate, but, on July 15, 1930, the conservator paid $10,539.89 of the assets of the estate to the

Security Bank to discharge these notes. There is no satisfactory proof that demand was made on the principal debtor, Louis F. Nonnast Sons Inc. for payment, before the bank demanded payment from the supposed guarantor's personal representative. Neither is there any definite proof of the date or the amount named in the lost written guaranty, or payment of what accounts, if any, was guaranteed thereby.

In the latter part of May, 1930, following the death of Nonnast, the Northern Trust Company called a meeting to decide what should be done about the business of Louis F. Nonnast Sons, Inc. This meeting was attended by three officers of the trust company, the attorney for it as conservator, the secretary and bookkeeper of the furniture company and Emory Nonnast. At this meeting, it is stated, it was decided to liquidate the company. About the same time two directors of the furniture company resigned. An officer of the trust company and the attorney for it as conservator, were elected, and Theel, the secretary of the furniture company, was the third director. Since there were only three directors, this placed the absolute control of the furniture company in the trust company. Although liquidation had been decided upon, the conservator instructed Thulin & Company, who were accountants, to install a cost accounting system for the furniture company and also to furnish a manager. D. T. Hill, an employee of Thulin & Company, was made manager at a salary of $325 a month. This $325 a month was paid to Thulin & Company for several months, but Hill only received $200 a month. He began work June 1, 1930. On August 2, 1930, the conservator paid Thulin & Company the sum of $1300, made up of the June salary for Hill and $975 for the audits already mentioned. On September 9, 1930, before the will was proved and before letters testamentary issued, and also before the conservator's report was filed, the trust company, as executor, paid Thulin & Company $1625 as salary for Hill, for the months of July to November, inclusive. From

December on, Hill's salary was paid by the furniture company directly to him. No furniture was manufactured by the Louis F. Nonnast Sons, Inc. after the middle of February, 1931.

In 1929, Louis F. Nonnast Sons, Inc., by W. H. Theel, its secretary, entered into a contract with the Commonwealth Edison Company for the purchase of electrical equipment for the factory. The price was $28,833.34 payable in monthly installments. This was a conditional sales contract, and it was not signed by Louis F. Nonnast in any capacity. Beginning with February, 1931, the executor made four payments on this contract totalling $2988.15, although no claim was ever filed by that company or made against Louis F. Nonnast either before or after he died. There is no evidence that Louis F. Nonnast ever executed any written guaranty of the payments due under this contract.

The trust company proceeded with the liquidation of the furniture company, and paid all its creditors in full except the estate of Louis F. Nonnast. That estate was the furniture company's main creditor, yet it received only $1600 out of the $47,253.22 paid to creditors.

The trust company negotiated a sale of the equipment and inventory of the furniture company to three men named Ryan, Doyle and Hayes. On August 4, 1931, the executor obtained the approval by the probate court of a contract for the sale of these assets of the furniture company for $65,000, nothing down, but on monthly payments commencing at $208.33, and leasing to the purchasers for five years the part of Louis F. Nonnast's building occupied by the factory. These purchasers assigned the contract and lease to a new corporation they formed, operated about nine months, used up the materials in the inventory, got in arrears with their payments of rent, etc., and their company went bankrupt.

There was a judgment against Louis F. Nonnast Sons, Inc., for personal property taxes in the amount of $5800. In the fall of 1931 this appears to have been compromised for $1200. The furniture company could only pay $600, and on October 5, 1931, the executor advanced the remaining $600. This has not been repaid.

The executor held, among the assets of the estate, notes given by the Grand Rapids Furniture Company to Louis F. Nonnast, for $2250. The Grand Rapids Furniture Company went into bankruptcy, but instead of the executor filing a claim on these notes in the name of the estate, the claim was filed in the name of Louis F. Nonnast Sons, Inc. That company received a net dividend on the claim in the amount of $234.85, and the Nonnast estate got nothing. This is not explained.

The trust company retained $5000 as conservator's fees, and $5500 for its services as executor. Fees aggregating $11,000 were paid attorneys who represented the conservator and the executor. No proof was made as to the reasonable value of any of the services for which this $21,500 was paid or retained.

A claim of $1350, the cost of a tombstone, was filed by Pechar & Company against the testator's estate. It was never allowed, but the appellant as executor paid it in full and says this was a contractual liability Louis F. Nonnast incurred before he was incompetent and that it had authority to pay the claim. On March 1, 1930, the day the petition was filed to have Louis F. Nonnast declared incompetent and for the appointment of a conservator, Pechar & Company's representative, Brennecke, says he called on Louis F. Nonnast at his home. It must be remembered that at the time Nonnast was paralyzed and could neither talk nor write. The contract for the tombstone was signed on behalf of the father by the son Emory Nonnast who did not testify. Objection to the introduction in evidence of the

written contract was overruled. The admission of Mr. Brennecke's testimony given in the probate court was objected to in the circuit court, but if that testimony were considered, there is sufficient other testimony to fully demonstrate that Louis F. Nonnast's condition was such on March 1, 1930, that he could not have said and done what this witness testified he did say and do.

It is agreed that no claims were filed against the incompetent's estate and that in addition to the Pechar & Company claim only three other claims were filed after the executor was appointed. There is no objection to payment of the claim of A. L. Bentley & Sons, that of the First Wisconsin National Bank, and payment of $5000 in settlement of Caroline Johnson's claim for $10,560, which are the three claims last mentioned.

The eighth objection to the conservator's report was withdrawn as were also the objections Nos. 14, 15, 16, 17 and 19 to the executor's reports.

The third objection to the executor's reports deals with $37.20 paid to Nu-Art Engraving Company. It is not argued and will not be considered.

The ninth objection to the conservator's report, in addition to items already mentioned, contains objection to various items that were paid by the conservator after Louis F. Nonnast died and for which no claims were ever filed. These items are: Taxi fare, R. E. Agee to Nonnast plant, $45.50; Ellen Turnwell, nursing services, $24; Abenpost Company, death notice, $6.30; Commonwealth Edison Company, light bill, $3.30; Peoples Gas Light and Coke Company, gas, $1.68; Bittner, groceries, $5.80; Caroline Johnson, household expenses, $167.61; Michigan Bell Telephone Company, telephone bill $10.78; M. E. Stockenberg, meats, $13.25; Hyde, Westbrook, Watson and Stephenson, legal services, $2000, and court costs advanced by that firm in the amount of $45.30; R. W. Colwell, traveling expenses to inspect Michigan summer home, $20; A. Fossberg, labor

and materials used in spraying, $15.77; Andrew Exple, pump repairs, $4.30; Otis Horton, labor, $387.12; F. P. Cupp, lumber, $3.75, the total of which is $2743.68 instead of the $2754.46 as computed by appellees.

No notice was given when the trust company filed its first and final account and report as conservator, October 21, 1930, and the probate court properly held that the conservator's account, as well as the executor's accounts, were subject to objection by appellees. On March 27, 1933, the executor, without notice except to itself as trustee under Louis F. Nonnast's will, filed its first current account and, on March 3, 1936, it filed its final account. The appellees filed objections to the three reports which were amended after the executor filed its amended and final account on March 3, 1936. The executor also filed on March 27, 1936, its supplemental second and final report.

Except as to payment of $500 made to the Commonwealth Edison Company more than a year after the date letters testamentary issued, the probate court overruled all objections. On appeal the circuit court likewise overruled all objections. The Appellate Court for the First District reversed this decree of the circuit court of Cook county and surcharged the Northern Trust Company with various amounts. This court granted leave to appeal to the trust company and the appellees have assigned cross-errors.

The appellant relies on what was contained in section 5 of the Lunatics act (Cahill Stat. 1929, chap. 86, sec. 5,) wherein it was provided: "Such conservator shall have the care and management of the real and personal estate of his ward," section 17 of the same chapter which provided: "The conservator shall manage the estate of his ward frugally and without waste, and apply the income and profit thereof, so far as the same may be necessary, to the comfort and suitable support of his ward and his family, and the education of his children," and section 38 of that chapter which provided: "When any person for whom a conservator has

been or may be appointed under the provisions of this act, shall be restored to his reason * * * such person may apply to the county court of the county in which such conservator was appointed, to have said conservator removed, and the care and management of his property, or so much thereof as shall remain, restored to him." It contends that these sections, certain decisions of other States, and the language found in *First State Bank of Steger* v. *Chicago Title and Trust Co.* 302 Ill. 77, 83, concerning the broad powers of a conservator, justify it in carrying on the business of Louis F. Nonnast Sons, Inc. in which he held all but 150 shares of stock, and in using the funds of his estate, first as a ward, and later, of his estate after his death, in that business, and in the payment of his debts without having claims filed and allowed in the probate court. Immediately after its appointment as conservator the trust company knew that the furniture company was in desperate financial straits, had no cash on hand, had a pay-roll over due and had overdrawn at the bank. The fact was that Louis F. Nonnast Sons, Inc. had lost nearly three hundred thousand dollars during the five previous years and had lost $36,310.20 during the first two and one-half months of 1930. This was also known at once by the trust company. The question is not presented here as to what, if anything, could be authorized properly by the probate court if this were the private business of the ward. Here, the probate court, at the instance of the trust company, purported to authorize the conservator to lend $17,500 of the ward's money to an insolvent corporation. It has been pointed out that the trust company advanced $15,200 before the ward died and proceeded to advance $4800 (making a total of $20,000) before letters testamentary were issued to it. Still later, as executor, without any such power given in Louis F. Nonnast's will, it again sought and obtained what purported to be authority from the probate court to advance $6500 more to the corporation. There

is no power in law, either in the court or the conservator or executor, to make such advances, and the orders and the acts done under and beyond them were void and illegal. In *Chapman* v. *American Surety Co.* 261 Ill. 594, 603, it was held that the acts of a guardian which transcended his statutory authority could not be approved or ratified by the probate court, and the same principle is involved here.

An executor cannot continue his testator's business unless a clear intention to have this done is shown by his will. (*Smith* v. *Preston,* 170 Ill. 179, 188.) Here, although Louis F. Nonnast had been in charge of this corporation, it was not his individual business, and there is no intention shown and no express authority given by his will to the trust company, appellant, as executor, either to carry on that business or to advance $6500 or any other sum to the corporation.

The trust company, as executor, relies on Nonnast's will which provides: "I also give my said executor full power and authority to settle and compound any claims either in favor of or against my estate, as to my said executor shall seem best, and for the purpose aforesaid, to execute and deliver all proper and necessary conveyances and to give full receipts and discharges." But this cannot, in any sense, be construed to authorize the trust company, as executor, to lend $6500 from the estate of Nonnast to the furniture company or to advance the $600 used in compromising the personal property tax judgment against that company. If, for the sake of argument, we interpreted this clause of the will to mean that the executor could compromise claims without their having been filed, proved and allowed in the administration proceedings, yet where objections are filed, as here, it is the duty of the executor to prove the claims it paid were just, owing and correct as to amount. With reference to claims for services, it would also have to prove the reasonable value of the services if no fixed amount had been agreed upon by the testator in his lifetime with the

claimant. If rendered to the estate, the personal representative must show the necessity and the reasonable value of such services. There is no burden on the objector to disprove the validity of claims that were not filed, proved and allowed.

In Horner's Probate Practice, third edition, page 880, in discussing a conservator's duty to account, the author says: "Of course these accountings and final settlements are governed by the rules applicable in cases of guardianship." On page 799, in discussing settlements and final accounts of guardians, he says: "Where the proceedings on the final report are *ex parte,* the judgment is only *prima facie* correct, and is open to subsequent correction or challenge; and on appeal from an order of approval, the items must be proven, as the trial in the circuit court is *de novo."* Also, at page 793, the following appears: "At common law, as we have seen, all guardians were regarded as trustees, clothed with all powers and rights necessary to the discharge of their duties. All guardians were compelled to render an account in chancery, excepting guardians in chivalry, and they were excepted because they owned the rents and profits of the ward's lands. Our statute not being a complete code, but its primary object being to confer jurisdiction on the county court, the powers of that court and of the probate court, in relation to the account of guardians, are not confined to those given by the statute, but are co-extensive with those of a court of chancery. [Citing *Bond* v. *Lockwood,* 33 Ill. 218.] The rules and principles of equity must prevail in matters pertaining to settlements of guardians; the aid of courts of equity has always been invoked to compel the execution of the trust and to secure the protection of the infant. In this respect the statute has made no change, though the existence of a complete remedy in these inferior courts may make a court of equity less inclined to interfere."

In Perry on Trusts and Trustees, seventh edition, page 1397, it is said: "A trustee or executor is bound to keep

clear, distinct, and accurate accounts. If he does not, all presumptions are against him, and all obscurities and doubts are to be taken adversely to him. (The burden of proof is upon a trustee to show that the charges or expense for which he claims credit upon an accounting were proper disbursements.)"

In *Crimp* v. *First Union Trust and Savings Bank*, 352 Ill. 93, at page 103, this court said: "Under the rule above stated, the trustee is required to make clear proof of the necessity or apparent necessity of the expenditure of the trust fund for the protection of the estate. Defendant has wholly failed in this regard, and the claim for deduction on account of the payment of these fees cannot be sustained."

Conservators, executors, administrators and guardians serve in the same fiduciary capacity as trustees. If they pay out money without having claims filed in the estate of the ward or the decedent, a conservator, guardian, administrator, or executor, upon objection being filed to his final report, has the burden to make as complete and satisfactory proof as would have been required had the creditor who received payment, filed his claim, made proof and obtained an order of court for payment of the claim.

As was said by Mr. Justice Cardozo in *Meinhard* v. *Salmon*, 249 N. Y. 458, 164 N. E. 545, 546: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the *punctilio* of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'distintegrating erosion' of particular exceptions. (*Wendt* v. *Fischer*, 243 N. Y. 439, 444.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by

the crowd. It will not consciously be lowered by any judgment of this court."

Counsel for appellant argues that the appellant should be excused because the panic was on in 1930, that "hindsight is better than foresight," and that the legal justification for the acts of the conservator and the executor are bolstered by the good intentions of the trust company and its desire to follow its ward's wishes. These things furnish no authority in law to a conservator or an executor to do what was done here. It loaned $20,000 as conservator and $6500 as executor, without lawful power or authority, and the $26,500 was not repaid.

As to the appellant following the wishes of the incompetent ward, see *Waterman* v. *Alden,* 144 Ill. 90, where a trustee tried to excuse his neglect in collecting a debt on the ground that the deceased, if living, would rather have lost the debt than pressed for collection.

On July 2, 1930, after Nonnast had died* and before letters testamentary were issued, the conservator paid $10,539.89 to the Security Bank of Chicago. Also, after Nonnast's death, but shortly prior to July 2, without notice, the conservator had obtained an order from the probate court of Cook county to pay trade acceptances of the Grand Rapids Furniture Company which it alleged had been discounted at the Security Bank. The trust company represented to the court that its ward had guaranteed payment of such trade acceptances to the bank. In the trial of these objections in the probate court an alleged written guaranty seems to have been produced, but on appeal to the circuit court of Cook county, at the trial *de novo,* it was claimed the instrument had been lost. None of the bank's witnesses and the trust company's witnesses knew the date or amount named in the supposed agreement, and the evidence shows that no demand was made and no action taken against the Grand Rapids Furniture Company, which is not shown to have had any trade acceptances that had been discounted by

the Security Bank of Chicago or Louis F. Nonnast Sons, Inc., which company turned out to be the maker of three promissory notes held by that bank. The conservator did pay, apparently, the ten thousand odd dollars to the bank in discharge of the Louis F. Nonnast Sons, Inc.'s three notes but no claims as to them were ever filed, proved, allowed or ordered paid by the probate court.

Section 55 of an act to revise the law in relation to incompetents, idiots, lunatics, drunkards and spendthrifts (Cahill Stat. 1929, chap. 86, par. 56) requires claims to be established in a conservatorship in practically the same manner as in the administration of decedents' estates. There is uncertainty here as to what Louis F. Nonnast agreed he would guarantee payment of, if anything. The proof in the trial *de novo* did not justify payment by the conservator of Louis F. Nonnast Sons, Inc. notes and it is not entitled to claim credit in its account for payment of the $10,539.89 so paid.

William H. Theel was secretary of, a stockholder in, and one of the directors of Louis F. Nonnast Sons, Inc. He was permitted to testify, in spite of this, that Louis F. Nonnast guaranteed payment, orally or otherwise, of all debts of that company. A letter which Theel wrote to Heath & Milligan Manufacturing Company was introduced in evidence. The letter stated that Nonnast guaranteed payment of all the company's debts. Theel's testimony and this letter were objected to and it was error to overrule the objections. Theel had a direct interest as a stockholder adverse to these objectors, who are the appellees and heirs of Louis F. Nonnast, and was not a competent witness. The Heath & Milligan Manufacturing Company had nothing to do with this case and what Theel wrote them about Nonnast guaranteeing payment of company purchases was not admissible.

On August 2, 1930, the conservator paid to Thulin & Company, accountants, $975 for an audit of the books of

Louis F. Nonnast Sons, Inc. and the estate of the incompetent ward. The conservator included $325 as one month's salary of D. T. Hill, an employee of Thulin & Company, although Hill received only $200 therefrom for his services at the furniture factory. It will be recalled that the decision to liquidate the company had already been made but, in spite of this, Hill was supposed to be instituting a cost accounting system for the furniture company. He began work there on June 1, 1930. The payment of this $1300 was made on August 2, 1930. About the time that Hill began to work, two directors of the company resigned and the conservator's attorney and one of its officers or employees were made directors of Louis F. Nonnast Sons, Inc. The secretary, Theel, was the remaining director. This gave the trust company complete control of the furniture company and its business. Later on, Hill was elected president of Louis F. Nonnast Sons, Inc.

On September 9, 1930, the conservator paid Thulin & Company $1625, five months' salary for Hill, about three months of which was in advance. The $1625 was later carried into the executor's account as a credit. No claim for any of Hill's salary was ever filed, proved or allowed in court. The first time Hill was paid his salary directly and not through Thulin & Company, was December 1, 1930, and for that month. It must be remembered that Hill was at all times working for Louis F. Nonnast Sons, Inc., not for the conservator, its ward or the executor. These salary payments must be surcharged against the appellant.

It was proper, however, for the conservator to make an audit of its ward's assets and financial affairs, to determine what, if anything, could be done to protect his claims for nearly $300,000 against Louis F. Nonnast Sons, Inc.; it was also proper, by permission of the probate court of Cook county, to have the audit made of that company. The charge of $975 made by Thulin & Company for four

weeks' work in making the two audits is sufficiently high, no doubt, but in view of the circumstances in evidence credit for it should be allowed the appellant.

Without so much as a "by your leave" the trust company, as executor, on October 5, 1931, took $600 out of the estate and put it with $600 of the funds of the Louis F. Nonnast Sons, Inc. With the $1200 it settled a personal property tax judgment against Louis F. Nonnast Sons, Inc. for a far larger amount. Similarly, while negotiations were on for the sale of the machinery and inventory of the furniture company, on January 9, 1931, the executor paid $25 for appraisal of the furniture company's machinery made by the Yates American Machine Company. No claims were ever filed for the $600 tax settlement money or the $25. The items paid as Hill's salary, for appraising the furniture company's machinery, and the advancement of $600 in settlement of the personal property tax judgment, total $2575.

From February 17, 1931, to October 27, 1931, the executor made four payments totalling $2988.15 to the Commonwealth Edison Company on a conditional sales contract Louis F. Nonnast Sons, Inc. by Theel, its secretary, had made in purchasing electric motors and equipment for the furniture factory. The record shows a letter from the executor's attorney advising it that it was not liable on the contract. Louis F. Nonnast's name did not appear in any capacity on this contract and there is no evidence in the record that he ever guaranteed its payment. The furniture factory was in a part of a six-story building on Halsted street in Chicago, which belonged to Louis F. Nonnast but which was mortgaged for $150,000. The mortgage later was foreclosed and, if, as was made to appear in the audit, he ever had an equity of a like amount in the real estate, it seems to have been lost or to have been wiped out in the decline in property values. One tenant stored rags and waste in a three-story building on the premises, and there was another tenant in the six-story building. The electrical

equipment was in the larger building. There were no passenger elevators and the five or six freight elevators were operated with the electrical equipment mentioned above. The executor seeks, without avail, to justify payment of the $2988.15 on the ground that if it had not been paid, the Commonwealth Edison Company would have repossessed its chattels, and the elevators and switch-board could not have been operated, the sprinkler system would have been out of commission, the insurance would have been canceled, the tenants would have moved and rents would have been lost. Most of the payments here in question were made after the inventory and machinery were sold to Doyle, Ryan and Hayes. The furniture company itself ceased doing any manufacturing after February, 1931. No claim, of course, was ever filed or made by the Commonwealth Edison Company against the estate of Louis F. Nonnast.

Witnesses for appellant say they had an extended conversation with Louis F. Nonnast, March 6, 1930, the day letters of conservatorship were issued. They say the trust company gleaned from that conversation that Nonnast wanted to protect his good name and reputation, that he wanted the furniture company's debts all paid even if it took his own securities and assets to pay them, and that this was to be done to the exclusion of the large debt it owed Nonnast. He had taken more than $200,000 worth of notes from the company for advances he had made to it and it owed him more than $60,000 additional. There is a grave doubt that this victim of paralysis, who could only nod his head and who could say, if anything, only one or two words, ever indicated any such intentions or gave any such directions. Assuming for the sake of argument that he did make known such wishes, by what authority in law can a conservator bind itself to follow the directions of its ward or excuse itself for so doing?

Accompanying this reliance on the supposed wishes and directions of the ward, is the claim that the conservator

had a right to take over and operate the Louis F. Nonnast Sons, Inc., pay its debts, except what it owed Nonnast, the main creditor, and advance it money from his private means, because he owned ninety-five per cent of its stock. Appellant relies on *Pepper* v. *Litton,* 84 L. ed. 160, but that case was shot through with fraud. It involved an attempt by Litton to defraud Pepper, the only remaining general creditor of a bankrupt coal company. Louis F. Nonnast did not have "a one man corporation" although he owned 2850 of the 3000 shares of the capital stock of Louis F. Nonnast Sons, Inc. The nearly three hundred thousand dollars he advanced to that company was advanced in good faith, and he was guilty of no fraud on the company or its creditors. The case relied on is not in point.

The executor did cause the last $1600 in the treasury of the Louis F. Nonnast Sons, Inc. to be paid it for the estate of the testator, but it was derelict in its duty and grossly negligent in failing to collect for that estate its proportionate part of what was paid by the furniture company on its debts. It was in full control of the Louis F. Nonnast Sons, Inc. and collected and paid on debts of the furniture company $47,253.22. On March 15, 1930, the Louis F. Nonnast Sons, Inc. owed $395,364.82 to its creditors and on that day it owed Louis F. Nonnast $283,000. His claims against the Louis F. Nonnast Sons, Inc. represented seventy-one per cent of its liabilities. We cannot speculate on what might have happened if the trust company had conducted the affairs of its ward and testator's estate differently. The fact is it caused $47,253.22 to be paid on that company's debts. If it had exercised diligence and fidelity to the trust reposed in it as the fiduciary of an incompetent ward and as executor of his estate, after his death, it would have collected seventy-one per cent of that sum, or $33,549.78, instead of the $1600 it did collect for the testator's estate. The difference between these amounts, or $31,949.78 is chargeable to the trust company as executor.

Section 9 of the Lunatics act (Cahill Stat. 1929, chap. 86, sec. 9) provided, among other things: "If an administrator is appointed he shall supersede such conservator, whose functions shall thenceforth cease and determine; and it shall be the duty of such conservator to deliver up to his successor all the goods, chattels, moneys, title papers and other effects belonging to such deceased ward in like manner as provided in section 35 of this act." Section 35 deals with the removal, resignation or death of a conservator. Section 56 provided, as now, that claims must be filed in the proper court against the estate of the ward. The conservator and executor ignored this provision and only four claims were ever filed in the testator's estate and none during the conservatorship. The only claim filed in either estate that is in controversy is that of $1350 on an alleged contract Louis F. Nonnast is supposed to have made for the purchase of a tombstone after his cerebral hemorrhage and paralysis.

It is true as argued by appellant, that section 9 of the chapter above referred to, also provided that in case of the ward's death, the conservator should administer his estate without additional letters, unless an administrator was appointed within sixty days. However, it is provided further that upon the appointment of an administrator, the conservator shall make a full accounting to him. Whether there is a conservator or an administrator or an executor, claims against the ward, if living, or his estate if he is dead, should be filed in the court that issued the letters of conservatorship or administration, and they must be proved, allowed and ordered paid. This court has held that our statutes must be construed together and that it is mandatory to have letters testamentary issued to the executor named in a will if he is ready, willing and qualified to act after the will is proved and admitted to probate. (*Clark* v. *Patterson,* 214 Ill. 533.) In *Belleville Savings Bank* v. *Schrader,* 214 Ill. App. 388, that court held that such an

executor could compel a conservator to account to him and permit the executor to complete the administration of the decedent's estate. A petition for *certiorari* in that case was denied by this court.

We have already held that where claims are paid by a personal representative without filing, proof or allowance, the burden is on him to justify such payment. Here, the record shows no proof whatsoever as to the validity of the sundry items of indebtedness totalling $2743.68 detailed above. No claim was ever filed, proved or allowed for any part of this sum. Neither was any proof made of the validity of these claims in the circuit court to justify their payment. It was the duty of the executor to obtain an accounting from the conservator and to collect from itself, as conservator, this $2743.68.

The trust company held notes of the Grand Rapids Furniture Company as assets of the Nonnast estate. About the time it was appointed conservator, the Grand Rapids Furniture Company was adjudicated a bankrupt. For some unexplained reason a claim against the bankrupt estate was filed on these notes on behalf of Louis F. Nonnast Sons, Inc. and that company received a net dividend of $234.85 thereon. The executor is liable for its failure to collect debts due the estate. (*Waterman* v. *Alden, supra.*) The trust company must account for this $234.85.

We come now to the $1350 tombstone item represented by the claim of Pechar & Company. Pechar's representative, Brennecke, says that on March 1, 1930, Nonnast approved the tombstone shown on the sketch attached to the supposed contract; that he agreed to the terms of the contract and directed his son Emory to sign the contract for him. The executor claims this was a contractual obligation Louis F. Nonnast entered into before he was declared "a distracted person" or an incompetent, and although the claim was never allowed, the executor paid it and asks credit for the $1350 in its report. The price of a tomb-

stone is not a debt of the testator's estate. (*Morgan* v. *Morgan,* 83 Ill. 196.) We are not convinced by the testimony of Pechar & Company's agent, who claims he obtained this contract from Louis F. Nonnast, that this was done, or that, in view of his condition, Nonnast was able to enter into the discussion and contract. This credit of $1350 cannot be allowed to the executor.

As conservator, the trust company took credit for part of $5000 claimed to be due for its services as conservator's fees, and, as executor, it took credit for the balance of this $5000. It also asks credit for $5500 for its services as executor and for $11,000 attorneys' fees. There is no proof as to the value of any of these services. An administrator, executor or conservator is entitled to fees as compensation for services rendered but not for neglect of duty. (*Edwards* v. *Lane,* 331 Ill. 442.) There was no proof of the nature, extent or value of any of these services. These claims for services totalling $21,500 are not allowed.

The Northern Trust Company, as conservator, is surcharged with the loans of $10,000 made on March 19, 1930; $2200 made on March 22, 1930; $3000 made on March 29, 1930; $3070.55 and $1729.45, both made on June 24, 1930, to Louis F. Nonnast Sons Inc. This totals $20,000. It is also surcharged with $10,539.89 paid the Security Bank of Chicago, July 15, 1930, in discharge of three notes of Louis F. Nonnast Sons, Inc.; $325.00 paid to Thulin & Company, August 2, 1930, as D. T. Hill's salary; $971.12 it retained as conservator's fee, September 15, 1930; $1000 attorney's fees paid August 2, 1930, and $2743.68 paid on divers claims after its ward's death, which claims were not filed, proved, allowed or ordered paid.

As executor, the Northern Trust Company is surcharged with $2000 loaned on November 22, 1930; $2500 on November 28, 1930; $1000 on December 16, 1930, and $1000 on December 31, 1930, totaling $6500, all loaned to Louis F. Nonnast Sons, Inc. It is also surcharged with $1625 it

claims credit for that it paid as executor, as Hill's salary, September 9, 1930; four payments to the Commonwealth Edison Company, $496.05 paid February 17, 1931, $996.05 paid March 24, 1931, $996.05 paid April 29, 1931, and $500 paid on October 27, 1931, totaling $2988.15; $600 paid in settlement of personal property tax judgment against Louis F. Nonnast Sons, Inc., October 5, 1931; $234.85 paid as a dividend in the bankruptcy proceedings against the Grand Rapids Furniture Company; $1350 paid for a tombstone; $5500 executor's fees; $4028.88 balance of $5000 claimed by it as conservator's fees, which balance was paid October 5, 1935; $25 paid the Yates American Machinery Co. January 9, 1931, and attorney's fees, $10,000. It is also surcharged with $31,949.78 which it failed to collect on the notes and other indebtedness due from Louis F. Nonnast Sons, Inc. to the testator, Louis F. Nonnast.

The appellees contend that under the Administration act (Cahill Stat. 1931, chap. 3, par. 116,) the Northern Trust Company is chargeable with interest at the rate of ten per cent per annum on all moneys, notes, bonds and credits it withheld after a period of two years and six months from the date letters testamentary issued to it, which was October 8, 1930, and that this charge applies to all items surcharged either against it as conservator or executor. While a conservator is authorized to administer on its ward's estate, if he dies, without additional letters of administration, and must do so under the laws applicable to and in the manner prescribed for administration of estates, the ten per cent interest is not specifically imposed on conservators who withhold moneys, bonds, notes and credits more than two years and six months from the date they received their letters of conservatorship, or more than a like period from the death of their wards. However, where, as here, there is a gross abuse of their authority, conservators are chargeable with compound interest. The trust company, as conservator, must pay compound interest at the rate of five per cent per

annum on all the items surcharged against it from the dates those items were paid out by it as shown in the record in this case. *Mathewson* v. *Davis,* 191 Ill. 391.

The Northern Trust Company, as executor, is subject to the statutory interest of ten per cent from April 8, 1933, which is two years and six months from the date letters testamentary issued to it, on all the items surcharged against it, as executor, except the $31,949.78, which was not a liquidated item, and it is also subject to this interest charge on all other moneys, bonds, notes and credits which it withheld on April 8, 1933. (*Marshall* v. *Coleman,* 187 Ill. 556, 584; *Olsen* v. *Hartford Accident and Indemnity Co.* 368 id. 194; *McDonald* v. *People,* 222 id. 325.) The appellant has failed to excuse its delay in making settlement of this estate and under the statute, to avoid payment of the ten per cent interest charge, as executor, it was incumbent upon it to show good cause for withholding the assets and not making distribution. The section referred to above was designed to bring about speedy settlement of estates and it is applicable here.

Under the facts presented by this record all the costs in the probate court of Cook county, the circuit court of Cook county, the Appellate Court for the First District and in this court, are to be borne by the appellant, the Northern Trust Company. *Marshall* v. *Coleman, supra; Corrington* v. *Corrington,* 124 Ill. 363.

In so far as the judgment of the Appellate Court for the First District is consistent herewith it is affirmed, but the entire case is remanded to the circuit court of Cook county, with directions to render a decree in conformity to the views herein expressed.

*Affirmed in part but remanded, with directions.*

Mr. JUSTICE WILSON, specially concurring: I concur in this conclusion except as to the assessment of the interest penalties.

Mr. JUSTICE SHAW, dissenting:

In this entire record, I am unable to find any evidence of fraud, over-reaching or intentional wrongful conduct on the part of the Northern Trust Company or of its attorneys whose fees are denied. On the contrary, it is apparent that every effort was made to protect the estate of the deceased incompetent which was so seriously involved. The company might be charged with too much zeal for its ward but certainly with no wrongful motive or wrongful act. The item of $10,539.89 paid to the Security Bank of Chicago was clearly a debt of the estate and if there was any defect in proof, it was one that both parties overlooked and acquiesced in in the trial court. This item, with the conservator's fees, executor's fees, penalties and penalty interest, is wrong in my opinion. It is a very sound policy to look carefully after the interests of minors but we should also remember that adults and corporations also have a right to our consideration. The result of this opinion is to enrich minors at the expense of adults who have tried honestly to further the minors' best interests and it fails to appeal to my sense of justice.