*In re* ESTATE OF BERNARD BERGER, Incompetent (Restored) (Wayne Goodman *et al.*, Respondents-Appellants and Cross-Appellees, v. Bernard Berger, Petitioner-Appellee and Cross-Appellant).—MARYLAND CASUALTY COMPANY *et al.*, Respondents-Appellants, v. BERNARD BERGER, Petitioner-Appellee.—MARYLAND CASUALTY COMPANY, Petitioner-Appellee, v. DEBORAH GOODMAN *et al.*, Respondents-Appellants.

First District (3rd Division) Nos. 83—2875, 84—204, 84—1502 cons.

Opinion filed December 23, 1987.—Rehearing denied March 31, 1988.

1046

1048

RIZZI, J., concurring in part and dissenting in part.

Sidney Z. Karasik, of Chicago, for appellants Deborah Goodman and Gloria Roth.

Arvey, Hodes, Costello & Burman, and Rudnick & Wolfe, both of Chicago (Gary David Friedman and Donald F. Spak, of counsel), for appellee Bernard Berger.

Ira D. Schultz and Hinshaw, Culbertson, Moelmann, Hoban & Fuller, both of Chicago (D. Kendall Griffith, Lawrence R. Moelmann, and Joshua G. Vincent, of counsel), for Maryland Casualty Co.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

This case involves three consolidated appeals relating to improper disbursements from a recovered incompetent's estate.

In case No. 82—2875, petitioner Bernard Berger, a restored incompetent, filed objections to accounts approved during his 10-year period of incompetency. Petitioner alleges that the conservators acted improperly, resulting in his estate's depletion in excess of $200,000. Petitioner also sought to discover and recover funds and personal property. He served citations on his two daughters and their husbands, respondents Wayne and Deborah Goodman and Gloria and Philip Roth. Additional parties included respondent Maryland Casualty Company, which had issued a surety bond to the original conservator, and respondent Sheila Seidmon, the executrix of the estate of the original conservator, who died during petitioner's incompetency.

Following a trial without a jury, the trial court overruled several of petitioner's objections; entered judgment in favor of petitioner as to all other objections; surcharged the accounts of the first and successor conservators; ordered that certain personal property be returned to petitioner; and entered judgment against Maryland Casualty as bonding company, in the event of noncompliance with the surcharge judgment and turnover order.

Respondents contend on appeal that the trial court erred in disallowing disbursements which previously had been approved by the probate court; that the probate court's prior approvals of the annual accounts were binding upon petitioner absent a showing of fraud, accident or mistake; that the trial court erred in not applying the doctrine of substituted judgment; that petitioner ratified the manner in which his estate was handled; that the trial court erred in excluding certain testimony; and that the findings of the trial court are against the manifest weight of the evidence.

Petitioner has filed a cross-appeal against the respondent children, contending that the trial court erred in not sustaining his objections to a gift of $30,000 made by the conservator to the daughters.

In case No. 84—1502, Maryland Casualty filed an action for indemnity against the children, including counts based on subrogation for money had and received, and for a constructive trust. The trial court entered summary judgment in favor of Maryland Casualty, and the respondent daughters appeal from that order.

In case No. 84—204, Maryland Casualty and Seidmon filed a petition to have conservator's fees awarded to the conservator's estate. The trial court denied the petition, and Maryland Casualty and Seidmon appeal, contending that the trial court abused its discretion.

In 1948, petitioner married his first wife, Janice Lee Efron. Respondent Deborah Rae Goodman was born in 1949, and respondent Gloria Jean Roth was born in 1953. Janice died in early 1969, and petitioner was the sole beneficiary in Janice's will.

On October 28, 1969, the court entered an order finding petitioner to be an incompetent and appointing petitioner's father-in-law, Theodore Efron, as conservator. At that time, Deborah was 21 years old and engaged to respondent Wayne Goodman. Gloria was 16 years old. In January 1970, petitioner's estate was valued at $142,776. Petitioner remained legally incompetent until June 1980, when he was restored to competency.

During the 10 years of incompetency, Efron filed nine current annual accounts with the court. Each account was approved. In addition, several petitions were filed and approved prior to the conservator's expenditures for certain individual items.

Efron died in September 1979, at which time petitioner's estate was valued at $387,264.87. Wayne Goodman, Deborah's husband, was appointed successor conservator. On June 26, 1980, the court entered an order restoring petitioner to competency. On January 29, 1981, Wayne filed Efron's final account, and filed the inventory of successor conservator, and the first and final account of successor conservator.

On June 2, 1981, petitioner was given leave to file objections to the final accounts of both conservators. On August 4, 1981, petitioner filed nearly 70 objections and a petition for the issuance of citations for the discovery of information and recovery of property.

We first address respondents' contention that the trial court erred in disallowing the numerous expenditures and gifts and in directing the turnover of certain monies and personal property to petitioner.

■■ ■ Generally, the trial court functions in a central role which permits it to oversee and control all aspects of the management and protection of the incompetent's estate. The court controls the person and estate of the ward, and directs the conservator's care, management and investment of the estate. (Ill. Rev. Stat. 1979 through 1981, ch. 110½, par. 11a—18; Ill. Rev. Stat. 1977, ch. 110½, par. 11—13; Ill. Rev. Stat. 1969 through 1975, ch. 3, par. 122.) The court protects the incompetent as its ward, vigilantly guarding his property and viewing him as a favored person in the eyes of the law. (*People ex rel. Miller v. Myer* (1964), 46 Ill. App. 2d 106, 196 N.E.2d 370, citing *Wann v. People ex rel. Birk* (1870), 57 Ill. 202.) The court must do nothing "wantonly or unnecessarily to alter the ward's property, but on the contrary takes care, for his sake, that if he recovers he shall find his estate as nearly as possible in the same condition as he left it." (*Lewis v. Hill* (1944), 387 Ill. 542, 546, 56 N.E.2d 619.) Upon the restoration of a person of unsound mind, that person has the right to be put in possession of his property and to ask the court to order the conservator to deliver and pay to him all money and property which he may have, or to which he may be entitled. *In re Estate of Hire* (1941), 309 Ill. App. 566, 33 N.E.2d 652, *rev'd on other grounds Hire v. Hrudicka* (1942), 379 Ill. 201, 40 N.E.2d 63.

■■ ■ The accounting and final settlement of a conservator are governed by the rules used in cases of guardianship. (*Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 29 N.E.2d 251.) The conservator shall "manage the estate frugally and shall apply the income and principal of the estate so far as necessary for the comfort and suitable support" of the ward and his children, or "for any other purpose which the court deems to be for the best interests of the ward." (Ill. Rev. Stat. 1979 through 1981, ch. 110½, par. 11a—18; Ill. Rev. Stat. 1977, ch. 110½, par. 11—13; Ill. Rev. Stat. 1969 through 1975, ch. 3, par. 122; see also *Proehl v. Leadley* (1967), 86 Ill. App. 2d 472, 230 N.E.2d 516.) The paramount duty of a conservator is to conserve and protect the assets of the incompetent person and to see that the assets and income therefrom are properly applied to the use, enjoyment and benefit of the incompetent. *Lewis v. Hill* (1944), 387 Ill.

542, 56 N.E.2d 619; *Proehl v. Leadley* (1967), 86 Ill. App. 2d 472, 230 N.E.2d 516.

The conservator must act with the degree of diligence which an ordinarily prudent person would use in conducting his own affairs. (*Parson's v. Estate of Wambaugh* (1982), 110 Ill. App. 3d 374, 442 N.E.2d 571.) The representative is a fiduciary and is held to the highest standard of fair dealing and diligence, and his behavior will be closely scrutinized by the courts to insure his adherence to these high standards. *In re Estate of Glenos* (1964), 50 Ill. App. 2d 89, 200 N.E.2d 65.

The conservator must present the court with accounts of receipts and disbursements for the court's approval. (Ill. Rev. Stat. 1977 through 1981, ch. 110½, par. 24—11; Ill. Rev. Stat. 1969 through 1975, ch. 3, par. 309.) The accounts must state the receipts and disbursements and the property which is on hand. (See generally 26 Ill. L. & Prac. *Mental Health* §24 (1956).) A conservator need not obtain a court order to expend money for the necessaries of a ward. (*People v. Broda* (1919), 215 Ill. App. 119.) The court may, however, disapprove, set aside, modify, or approve the representative's account. (*Edwards v. Lane* (1928), 331 Ill. 442, 163 N.E. 460.) The guardian should usually petition the court for permission to make large expenditures; otherwise, the guardian performs the acts at his own risk. *Parson's v. Estate of Wambaugh* (1982), 110 Ill. App. 3d 374, 442 N.E.2d 571.

When objections are properly filed to the accounts, the burden is on the representative to maintain by proof that the items objected to are just and proper. (*In re Estate of Roth* (1974), 24 Ill. App. 3d 412, 321 N.E.2d 81.) If the conservator pays out money without having a claim filed, upon objection being filed to his report he has the burden of making as complete and satisfactory proof as would have been required had the individual filed a claim, made proof, and obtained an order of court for the payment of the claim. *Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 29 N.E.2d 251.

The conservator and the surety on his bond are liable to any person aggrieved by the mismanagement of the estate committed to his care. Such person may institute and maintain an action against the representative and surety for all money and property which have come into his possession and are withheld or may have been wasted or misapplied and no satisfaction has been made. Ill. Rev. Stat. 1977 through 1981, ch. 110½, par. 24—18; Ill. Rev. Stat. 1969 through 1975, ch. 3, par. 318.

Respondents contend that the trial court's decision disallow-

ing numerous expenditures and ordering the return of certain personal property is against the manifest weight of the evidence. This court will not substitute its judgment for that of the trial court sustaining objections to a representative's final report, finding that a gift has not been made, or finding that property belongs to the ward, unless an examination of the record as a whole indicates the decision was against the manifest weight of the evidence. *Grieg v. Johnson* (1974), 22 Ill. App. 3d 646, 317 N.E.2d 627; *In re Estate of Cope* (1949), 337 Ill. App. 388, 86 N.E.2d 290 (abstract of opinion); *Storr v. Storr* (1946), 329 Ill. App. 537, 69 N.E.2d 916.

■■ ■ Furthermore, in a nonjury trial, the court alone judges the credibility of each witness and determines the reasonableness and weight to be given to the testimony of each witness when viewed in light of all the evidence in the case. (*In re Estate of Porter* (1963), 43 Ill. App. 2d 416, 193 N.E.2d 617.) The testimony of a disinterested third-party witness should receive more weight than that of the parties whose conduct is being questioned. (See *In re Estate of Glenos*, 50 Ill. App. 2d 89, 200 N.E.2d 65.) In this case, for example, petitioner's sister-in-law Sheila Seidmon testified that she was "very biased against" petitioner because he had caused a "rift in the family" and upset Deborah and Gloria. In addition, without sufficient explanation, Deborah repeatedly indicated doubt or ignorance as to many of the controlling facts which directly involved her. She gave answers such as, "I find that a difficult question to answer yes or no. I do. I'm going to say I don't know." She stated, "I would be guessing"; "I do have knowledge of it, but I don't have the answers to your questions, specifically"; and repeatedly, "I don't know."

■■ The suitable support of the ward's dependents is the only allowable purpose for which the ward's funds can be spent, other than for the support of the ward himself. (*In re Estate of Piech* (1969), 117 Ill. App. 2d 403, 254 N.E.2d 565.) Here, the trial court disallowed certain "living expenses" for both daughters.

In November 1971, the court ordered payments for Gloria of $400 per month as living expenses to be continued until she was no longer a student at the University of Illinois. Gloria split these payments with her sister. Deborah testified that she used the funds to support her own lifestyle. Without prior court approval, the conservator unilaterally increased the monthly support payments to $600, and then to $800 a month. Gloria continued to receive the monthly support checks after graduating from college and after her marriage.

The guardian *ad litem* testified that he did not object to the increased monthly payments because he believed "the amount that was

in excess of the $400 was consistent and in line with the station in life and the value of the estate" and the Probate Act's enumeration of a guardian's duty. Thus, he did not think an evidentiary hearing was required. The guardian *ad litem* also believed that the increased support payments were justified because of inflation. There was no evidence regarding inflation presented to the court. "[I]t was general knowledge."

Allowances for the support and maintenance of adult needy children may be granted where, *e.g.*, the child is indigent or in ill health. (*In re Conservatorship of Hall* (1885), 19 Ill. App. 295.) Disallowances are proper where there is no proof of necessity or duty to support. See *Wilcox v. Parker* (1887), 23 Ill. App. 429; see generally Annot., 24 A.L.R.3d 863, 889 §8(a) (1969).

We agree with the trial court's finding that after Gloria was married in August 1976, the right to receive the support payments ceased, and before her graduation, anything over $400 was not approved by the court and was improper. Thus, the court properly surcharged the conservator in the amount of $46,938. Similarly, the court properly surcharged funds used for other items related to Gloria's support, such as new clothes, her private telephone line in Deborah's home, and her automobile gasoline bills.

Deborah also received support-related payments from the estate. For example, she testified that she attended graduate school between 1970 and 1974. Her father's estate paid the costs, a total of $3,095.50, despite the fact that she was married in 1970. In addition, Deborah received payments of $200 and $264 as a married adult when she was not dependent on petitioner for support. The trial court properly surcharged these amounts.

As to the charitable contributions made by the conservator from the estate, a court ordinarily has no authority to permit donations which the ward was under no obligation to make. The court should not approve expenditures for general charities to which the ward had not been in the habit of contributing on a specific and regular basis while competent. (44 C.J.S. *Insane Persons* §81, at 191 (1945).) The charitable contributions here totalled $2,500. They were all made to the Zionist Organization, an entity to which petitioner had never contributed. The disbursements were properly surcharged.

The trial court also disallowed numerous expenditures for various gifts. The court found that the gifts had not received prior approval from the court and were not justified by any gift-giving pattern established by petitioner prior to his period of incompetency. See generally Annot., 24 A.L.R. 3d 863 (1969).

██ Respondent Maryland Casualty argues that the gifts were made in good faith. The supposed good intentions of the representative do not justify his defrauding the estate. (*People v. Levinson* (1979), 75 Ill. App. 3d 429, 394 N.E.2d 509, *cert. denied* (1980), 449 U.S. 992, 66 L.E.2d 288, 101 S. Ct. 527.) Good faith does not create authority for improper acts. (*Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 29 N.E.2d 251; *Parson's v. Estate of Wambaugh* (1982), 110 Ill. App. 3d 374, 442 N.E.2d 571.) "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Nonnast v. Northern Trust Co.*, 374 Ill. at 261, quoting Justice Cardozo in *Meinhard v. Salmon* (1928), 249 N.Y. 458, 464, 164 N.E. 545, 546. See also *In re Estate of Abbott* (1976), 38 Ill. App. 3d 141, 347 N.E.2d 215; *In re Estate of Busby* (1937), 288 Ill. App. 500, 6 N.E.2d 451.

Maryland Casualty points to "evidence of [petitioner's] past practice and conduct with respect to the gifts and promises he made his children." Maryland Casualty relies on evidence that petitioner and his former wife "led a very good lifestyle," including owning a summer home, dressing well, owning a fine, well-furnished home on the north side of Chicago, and taking their daughters on frequent trips and vacations. Furthermore, petitioner and his wife promised their daughters lavish weddings and college and graduate educations. "[N]othing was too good for their daughters or their future spouses."

Petitioner testified that he never made large cash gifts to his children prior to his incompetency. He never gave them any cash in excess of $100. He and his wife gave their daughters "the nominal type of gift as to a birthday or a holiday of some nature, nothing lavish or extravagant." He bought Deborah an opal ring with diamonds for her 16th birthday; bought Gloria some pearls following his restoration; and allowed the girls to use his charge accounts at women's clothing stores.

Seidmon testified that petitioner and Janice were devoted and generous parents. The children were given "everyday gifts," but not "large gifts of money and jewelry [because] they were children, so there wouldn't be gifts like that." They did buy "tremendous amounts of clothes for teenage girls." Petitioner and Janice also took the children on trips "probably once a year" after they were about 10 or 12 years old. Shortly after Janice's death, petitioner told Seidmon he wanted Deborah and Gloria to have Janice's personal belongings, such as a diamond watch, a diamond ring, and an opal bracelet.

Deborah testified that prior to his incompetency, petitioner had made cash gifts to the two girls. When asked if the gifts were of

$1,000 multiples, she replied, "I don't know." When asked if the gifts were in $3,000 multiples, she replied "Not to my knowledge." The largest cash gift she could recall was "cash gifts where they put some money into my bank account upon graduation and confirmation, but I could not tell you what the amount is at this time." Petitioner had been very generous. "There was nothing that he would not buy for us." He bought her an opal and diamond ring, an opal necklace, and pearls for birthday gifts. Petitioner bought her a mink jacket after her engagement, and on other occasions gave her a gold charm bracelet, gold earrings, pearl earrings, and a graduation trip to California.

Gloria testified that she received cash as gifts: "Initially when I was eight years old there was approximately 30 to 40 dollar bills stuffed in a yellow and orange rooster piggy bank on my dresser. That was saved from allowances that my parents had given me over the years. I did chores around the home and earned money." Gloria also testified that prior to the incompetency, she received $8,000 as half of her mother's life insurance policy. Otherwise, she received no large cash gifts from her parents.

In regard to vacation trips taken prior to the period of incompetency, petitioner testified that the family took no more than three or four trips, including trips to New York City, Los Angeles, and a few other places. Seidmon, Gloria and Deborah testified similarly.

The trial court surcharged the conservator for expenditures the daughters and Deborah's husband used for vacation travels. The estate paid the airfare for Deborah, her husband, and Gloria for two trips to Florida as anniversary gifts from the estate, and for a trip to Europe. Deborah testified that the trip was a graduation gift for Gloria, and "also part of the gift that [Deborah] never received that was promised to me by my parents." The purpose of the European and Florida trips was pleasure. The trial court surcharged the $3,611.34 for the Florida trips and the airfare to Europe.

The guardian *ad litem* (GAL), Herbert Gelderman, testified that he questioned the airfare for the Goodmans and Gloria to Miami. Gelderman believed that the cost of the airfare was approved because it was "expressed as an expense of the estate [and] was consistent with the value of the estate and the station in life of the parties." As to the trip to Europe, "They were interested in education, if I recall correctly. *** [Gloria] was probably interested in going to Europe to study." When asked if it was necessary for Gloria's sister and brother-in-law to accompany her, Gelderman stated, "I wouldn't know that."

Other gifts disallowed by the court included Gloria's $345 opossum jacket and Deborah's $350 gift in lieu of a jacket. The court dis-

approved three $1,000 gifts to James and Wayne Goodman; Gloria's expenditures of $300, $35.68 and $38.19, totalling $373.87; $152.24 to the Internal Revenue Service for gift taxes for gifts not properly authorized; and a $120.92 disbursement for "grandchild clothing."

In addition, the court disallowed $283.15 for stainless steel place settings Deborah bought for an anniversary gift for herself several months before petitioner was restored to competency. The court also surcharged $345.50 for a "Goodman anniversary gift"; $128.68 to Lord and Taylor for "Roths—belated house gift"; and $93.35 to Saks Fifth Avenue for "Gloria Roth—birthday gift" The evidence supports the trial court's findings that respondents failed to show any prior court approval for the gifts or to establish that the gifts conformed to a prior gift-giving pattern.

Respondents also challenge the trial court decision ordering the return of personal property to petitioner. The trial court was again faced with a credibility issue. In view of the nature of the subjective testimony offered by Deborah and countered by petitioner, we cannot say that the trial court's findings of fact on the question of ownership of the property are against the manifest weight of the evidence. For example, petitioner testified that a lady's wristwatch and gold ring passed to him upon the death of his first wife. He never made a gift of them to anyone else. Deborah testified that she had the jewelry and that her father gave her these items three or four weeks after her mother's death.

Petitioner also sought a 5½ karat diamond ring which had been Janice's and which he had never given to his daughters as a gift. Deborah told petitioner that she would relinquish the ring only if petitioner signed a letter stating that upon his death, the girls would get the ring. Her father gave her the ring several days after her mother's death. "I told him it belonged to my sister and I and that he could not have it." Deborah testified that she removed the ring from her father's safety deposit box in May 1980, shortly before his restoration to competency.

Similarly, Deborah claimed that she removed a gold and opal bracelet from her father's safety deposit box. "My father gave it to me and told me to hold onto it until [Gloria] was old enough to wear it."

In addition, Deborah testified that she was in possession of some of the coins sought by petitioner. She kept them in her safety deposit box. When asked how they came to be there, she simply replied, "I put them there." She could not remember when she took them, and asserted that Efron bought the coins so they could be handed down

through the family. In a related matter, the trial court surcharged the conservator for $129.63 and $141.96 for the investments in coins. The coins could not be located, and therefore the court found that the conservator had failed to preserve the assets of the estate.

Petitioner also sought the return of a French writing desk. Deborah testified that her father told her several times that she could keep the desk. At her deposition, however, Deborah stated that she did not remember if her father told her she could have the desk.

Other items sought by petitioner which his daughters claimed were gifts to them included mousse cups, a soup tureen, and a chocolate set. Deborah testified that she had the mousse cups, which were a birthday "gift to my mother, and my mother would have given them to my sister and I." Her father gave her the cups when he gave her the desk. She also had the tureen and claimed to own it because it had been given to her mother as a gift "by my sister and I, our funds." The chocolate set was also given to Deborah by petitioner.

Petitioner also requested the return of his table service, and Copeland-Garrett Spode plates. Deborah testified that she had the sterling silver table service for 12 in her basement:

"DEBORAH: It's in use. I keep it in my basement.

Q. I see. And how did you come to acquire it in your basement?

A. It was moved there.

Q. By whom?

A. The movers.

Q. From your apartment?

A. Yes.

Q. And how did it get there?

A. From my parents' home ***."

Deborah testified further that her mother gave her the silver before her death. No one else was present when the gift was made.

In regard to the Copeland-Garrett Spode plates, Deborah stated that she claimed ownership on the same basis as the soup tureen, *i.e.*, they were a gift from her father.

■ In summary, the court was entitled to find that these items, along with several similar pieces of personal property, including a man's ring and watch and some crystal glasses, were owned by petitioner and should be returned to petitioner. There was sufficient evidence to indicate that any purported gift was not made at a time when petitioner was legally competent to make a valid gift.

Petitioner also objected to the withdrawal of various sums from several different bank accounts. The trial court was again faced with

a conflict which it was uniquely qualified to resolve, *i.e.*, the credibility of each witness and the weight to be given to their testimony.

■■ Gloria testified that one savings account containing $15,098.79 belonged to her, notwithstanding the fact that her father was listed as a joint tenant. She had saved the money which she received as gifts for special occasions and had deposited money there "[p]eriodically from the time of my eighth birthday." Gloria had no documents to show the sources of the funds, but offered "some confirmation cards in a scrapbook if that would be of assistance to the court." The court found this evidence insufficient to allow a determination as to how much money, if any, Gloria contributed to the account. Because Gloria only had a survivorship interest, the funds were wrongfully transferred.

Deborah denied having "ultimately received" the funds contained in the account held jointly by Gloria and petitioner. When shown a check which closed the account, Deborah admitted that she had endorsed the back of it. Deborah asserted, however, that she did not spend the money. "It was my sister's. I would not take my sister's money, and I never will."

■■ Deborah testified that she and petitioner were joint tenants for a savings account containing $9,429.31, and an account containing $8,945.64, but that all of the funds belonged to her. She could not find the bank book for one account. The source of the funds included a gift from her father consisting of the funds from half of a $16,000 life insurance policy for her mother. Some of the funds came from savings bonds which she cashed. At her deposition, Deborah testified that she did not recall how much in savings bonds she cashed. At trial, Deborah stated that she had not done any further investigation, but that she had "refreshed [her] memory since the deposition." She was still unsure, but thought the cashed bonds "were in the total of $4,000 or $5,000." The trial court was entitled to find this evidence not credible, and insufficient to show whether she had contributed any of the money to the account, and therefore conclude that the sum was wrongfully transferred by the conservator.

■■ Respondents contend that the annual accounts were not subject to attack under the Illinois Probate Act because there was no evidence of fraud, accident or mistake. Section 24–11 of the Probate Act provides that, where a guardian *ad litem* is appointed to represent the ward at a hearing, the account as approved is binding upon the ward, absent fraud, accident or mistake. (Ill. Rev. Stat. 1983, ch. 110½, par. 24–11.) In challenging the trial court's decision, respondents rely heavily on the fact that a guardian *ad litem* was appointed

# 1064

to represent petitioner's interests for many of the annual accounts. The record shows, however, that the petitioner's interests may have received little protection in the proceedings. A guardian *ad litem* was appointed for all accounts except the second, seventh, eighth and ninth accounts. The accounts were also accompanied by timely notices, and had been approved by the Veterans' Administration. (Ill. Rev. Stat. 1983, ch. 110½, par. 24—11.) The guardian filed no written objections and approved all the accounts without any evidentiary hearing. He was satisfied with whatever assurances were given by the conservator's attorney. The appointed guardian testified, for example, that one of the reasons that he did not make a more detailed examination of the accounts was the fact that he assumed that the Berger family was a close knit family. He listed several indications of this closeness, including his assumption that the ward was of the Jewish faith; the fact that Deborah and petitioner had a joint safety deposit box; and the fact that the girls were petitioner's only next of kin. "And I indulged myself in the presumption that the close relationship between a father and two girls existed." Further indication of the closeness was the fact that "they lived together. And their station in life was such that I reached the conclusion that they were close."

In approving the accounts, Gelderman also considered the fact that the size of the estate was increasing. Also, the fact that Efron never requested a fee as conservator indicated to Gelderman "directly that Theodore Efron was interested, was interested in this estate and in the welfare of the incompetent." We would conclude from the record before us that even the GAL-approved accounts were approved without sufficient representation of the incompetent's interests.

In fulfilling his fiduciary duty, while held to the highest degree of care, the representative must inform the court fully of all material facts within his knowledge. The breach of this duty constitutes constructive fraud. (*Paskas v. Illini Federal Savings & Loan Association* (1982), 109 Ill. App. 3d 24, 440 N.E.2d 194.) The representative's acts may be construed as a fraud upon the courts if they have a detrimental effect upon public interests and public or private confidence. It does not require either actual dishonesty, intent to deceive, or any type of moral guilt. Instead, the law declares the conduct fraudulent because of its tendency to deceive others. (*In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 378 N.E.2d 1345; see also *People ex rel. Hawthorne v. Bartlow* (1983), 111 Ill. App. 3d 513, 444 N.E.2d 282.) Here, the conservator's conduct constituted constructive fraud, notwithstanding his good intentions. He failed to fully inform the court at the time each annual account was filed, *e.g.*, that

the support payments were for emancipated adults, that bank accounts did not clearly contain only the daughters' funds, that tax avoidance programs were not advisable, and that travel expenses for trips to Europe and Florida were excessive gifts which found no support in a prior gift-giving pattern and had not been first approved by the court. Thus, the "fraud, accident or mistake" test was met here.

Respondents argue, however, that the ward is bound by the court's approval of each annual account. Proceedings to settle accounts are not adversarial suits between parties. Instead, they are *ex parte* investigations as to the manner in which the conservator has discharged his duties in the management of the ward's estate. (*Kingsbury v. Hutton* (1892), 140 Ill. 603, 30 N.E. 600.) The court approval is not an adjudication binding on the ward. (*Hazelrigg v. Pursley* (1896), 69 Ill. App. 467.) Moreover, acts of a conservator which transcend his statutory authority cannot be approved or ratified by the probate court. (*Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 29 N.E.2d 251.) Thus, the court's approval of the annual accounts in the *ex parte* proceedings is only *prima facie* evidence of the proper management of the estate and, notwithstanding the absence of objection, exception or appeal made at that time, such proceedings are open to subsequent correction or challenge. *Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 29 N.E.2d 251; *Marshall v. Coleman* (1900), 187 Ill. 556, 58 N.E. 628; *Hazelrigg v. Pursley* (1896), 69 Ill. App. 467; *Wilcox v. Parker* (1887), 23 Ill. App. 429. See generally 44 C.J.S. *Insane Persons* §87(g) (1945). See also Annot., 63 A.L.R.3d 780 (1975).

In regard to the cross-appeal, petitioner contends that the trial court erred in overruling his objection to the $30,000 gift because he failed to seek the proper post-judgment relief. Following his restoration, petitioner objected to the $30,000 gift. On November 10, 1983, the court overruled the objection after finding that petitioner failed to file a petition for post-judgment relief within two years of his June 1980 restoration to competency as required by section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401).

Significantly, the trial court did not sustain objections to several other separate orders in this case. For example, in November 1971, an order was entered permitting the expenditure of $1,100 for tuition for Gloria and $400 per month for "living expenses" for Gloria as long as she remained a student at the University of Illinois. On September 25, 1973, the court entered an order permitting the disbursement of $7,359 to Deborah, and $3,993 to Gloria, from joint savings accounts naming both petitioner and one of the girls. On July 30, 1976, the court entered an order permitting the disbursement of

$5,000 to Gloria for her wedding and $6,000 to Gloria for living quarters after her marriage. On November 4, 1977, the court entered an order permitting annual gifts of $1,000 to Deborah's new son. Had the trial court sustained objections to these disbursements, petitioner would have been required to bring all these actions within two years of his restoration to competency, notwithstanding his affirmative act in filing specific objections to each of these disbursements in the probate action.

■■■ Upon restoration, an incompetent may have all prior accounts investigated by the court. (*Millard v. Harris* (1887), 119 Ill. 185, 10 N.E. 387; *Wilcox v. Parker* (1887), 23 Ill. App. 429.) He is entitled to have the entire administration of his conservator investigated and is not required to seek relief in chancery. (*Wilcox v. Parker* (1887), 23 Ill. App. 429.) The probate court may review and modify all previous judgments in the estate. (*Rawson v. Corbett* (1894), 150 Ill. 466; *Millard v. Harris* (1887), 119 Ill. 185, 10 N.E. 387; *In re Estate of Ekiss* (1963), 40 Ill. App. 2d 1, 188 N.E.2d 348.) The trial court here erred in finding it could not review the $30,000 disbursement and in finding that petitioner was required to challenge this disbursement in a section 2—1401 petition. Petitioner was restored to competency on June 26, 1980. On January 29, 1981, Wayne Goodman, as successor conservator, tendered the tenth and final account of the original conservator, and his own first and final account. The court granted Goodman leave to file the accounts and granted petitioner leave to file his objections to those accounts. Petitioner filed objections on August 4, 1981, before the final accounts were heard and within two years of the date of his restoration to competency. These included a specific, detailed objection to the $30,000 gift. On November 10, 1983, the trial court overruled petitioner's objection to the $30,000 gift. By this time, the period of two years after restoration to competency had passed and petitioner was barred from using section 2—1401 for relief.

■■■ Significantly, a petition to reopen an estate requires that the petitioner act with due diligence in presenting his or her claim to the court. (*In re Estate of Knoes* (1983), 114 Ill. App. 3d 257, 448 N.E.2d 935.) However, the due diligence requirements of the statute need not be rigidly enforced where unconscionable behavior is shown on the part of the estate representative. See Ill. Rev. Stat. 1983, ch. 110½, par. 24—9.

■■■ In addition, the rules and principles of equity prevail in matters pertaining to settlements of guardians. Courts may invoke equitable powers to compel the execution of a trust and secure the protec-

tion of the ward. (*Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 29 N.E.2d 251; *In re Estate of Ekiss* (1963), 40 Ill. App. 2d 1, 188 N.E.2d 348.) Under the circumstances presented here, principles of equity and fairness permit petitioner to challenge the $30,000 gift.

Furthermore, in regard to the merits of the challenge to the $30,000 gift, we find the objection should be sustained. The conservator's petition requesting approval for the $30,000 gift offered sketchy information. It informed the court only that the $30,000 gift "would be for the best interests of [petitioner's] children," and "would not interfere or be detrimental to the best interests of the incompetent." Because the expenditure was not "for the comfort and suitable support and education of the [petitioner's] children" (Ill. Rev. Stat. 1973, ch. 3, par. 122), it could only be classified as an expenditure "for any other purpose which the court deems to be for the best interests of the ward" (Ill. Rev. Stat. 1973, ch. 3, par. 122). The petition failed to include any explanation of how the $30,000 gift would be for the best interests of petitioner. The petition states only that petitioner should "be allowed to take advantage of the Internal Revenue Code," and "make said gift free and clear of any tax consequence." We conclude that the trial court erred in overruling petitioner's objection to the $30,000 gift.

The accounts also showed that $3,000 payments were made to each daughter annually for eight years. On many of the accounts, these were listed as "living expenses." Respondents now concede they were not living expenses and instead attempt to characterize them as gifts which would ultimately reduce the estate taxes which would be paid by their father's estate after he died. Petitioner testified that during his incompetency he spoke to Deborah about giving her $10,000 for her house, and she said, "You don't have to, Daddy, I'm getting $3,000 tax free."

The guardian *ad litem* recalled that "these living expenses for each girl were as a result of both being dependents of the incompetent." The daughters did not "have enough or means to support them in their station in life to which they were accustomed or which they lived." The age of the person was "immaterial." Moreover, he understood that the $3,000 to Deborah was paid as "a gift to her to balance off the $3,000" paid to Gloria. Gelderman explained that he found the term "living expenses" had no fixed meaning. The court surcharged the conservator in the amount of $48,000. The court found that the $3,000 annual payments were mischaracterized as living expenses until the ninth current account and thus were not disclosed as gifts at the time the accounts were approved. Moreover, they were not the

subject of prior court approval and were not supported by any gift-giving pattern established by petitioner prior to his incompetency.

Respondents present a similar tax-reduction argument in regard to the $30,000 gift to the daughters. In petitioner's cross-appeal, he contends that the trial court erred in not sustaining petitioner's objection to a $30,000 gift which the conservator made to petitioner's daughters. On December 1, 1972, the conservator petitioned the probate court for leave to make a gift of $15,000 to each of petitioner's daughters for estate tax reduction purposes. The petition states that the conservator "believes that it would be for the best interests of the children *** that the Incompetent be allowed to take advantage of the Internal Revenue Code" and make the $30,000 gift. The petition stated that the disbursement "would be a safe and sensible plan for his estate planning." A guardian *ad litem* filed an answer on March 27, 1973, stating that as to most "allegations of said petition, the [GAL] has no knowledge except by the averments of said petitioner, and for want of knowledge asks strict proof of the allegations of the petition." The GAL testified that on that same day, however, the court entered an order permitting the disbursement. The order stated that the expenditure was in the "best interests of the incompetent and his next of kin."

■■ ■ Respondents argue that the annual gifts of $3,000 and the $30,000 gift were proper because they constituted attempts to reduce petitioner's estate taxes. A court may authorize allowances for purposes other than support, such as sound estate planning by tax savings. (See generally Annot., 24 A.L.R.3d 863, 901 §16 (1969).) Noncharitable gifts out of an incompetent's estate may be made for the purpose of reducing his taxable estate, which in turn increases the amount available for the ultimate distributees. (See *In re Guardianship of Christiansen* (1967), 248 Cal. App. 2d 398, 56 Cal. Rptr. 505.) However, courts may deny requests to make a tax-saving gift where, *e.g.*, the court finds that it may be unlikely, but still possible, that the incompetent would recover and would write a new will. Moreover, the potential heirs could predecease the incompetent, which would effect a change in the parties who would inherit. Incompetence is not the legal equivalent of death, and tax avoidance is not a sufficient legal ground for the distribution to be made. *In re Estate of Bullock* (1957), 44 Del. Co. 171, 10 Pa. D. & C.2d 682, cited in Annot., 24 A.L.R.3d 863, 903 §16(b) (1969).

Petitioner testified that he objected to the $15,000 payments made to his daughters notwithstanding the fact that they might have been consistent with the advantage of having a lifetime gift tax exclu-

sion. Petitioner testified that he knew his will dated September 15, 1985, contained a provision for Federal gift tax purposes. We agree with the trial court, however, that there is "a large difference [between] signing a will with the boiler plate in it for taxes, and *** gifts to his children" while he is alive.

Gene Tempkin, a certified public account, testified for petitioner as an expert. In response to a hypothetical question, Tempkin opined that he would have advised a client in petitioner's position not to enter into a gift program for tax saving purposes. He explained that everyone is interested in avoiding taxes, but that a 46-year-old person (widowed or not, incompetent or not) should not enter into a gift program for either $3,000 annual exclusions, or a $30,000 lifetime exclusion.

Tempkin explained that in determining whether a gift program was advisable he considered whether the estate was in excess of the maximum estate tax, the age of the client, the financial condition and age of the potential recipients, and the desires of the potential donor. The fact that a donor's will expressly directs the executor to take advantage of the annual gift tax exclusion would not change his opinion. "Well, I don't understand how he could have made in his will a direction to make annual [inter vivos] gifts. I think the statement was that in his will, he—he looked to reduce his estate tax; and I said that that was pretty common in most wills ***." The will's language was read in court:

> "I hereby authorize and empower the executor to join [Janice] or with her executor or administrator in the making of a joint Federal Income Tax Return for the wife and me to consent for federal gift tax purposes to gifts made by the wife as having been made, one-half by me and one half by her, and to elect with expenditures or debts to deduct on the Federal Estate Tax Return or on any Income Tax Return whether of my estate of any benefits thereunder provided. The executor deems it to the best interest of my estate or of the beneficiaries thereof to do so."

Tempkin explained again that the language was a boiler plate, form provision. The estate could not reduce taxes by making annual gifts following his death. Instead, the gifts must be made prior to decedent's death.

Tempkin testified further that a 46-year-old man has an actuary life expectancy of about 22 or 23 years. He would not advise a gift program, because the man was so young, and "so many things could happen." He continued, "The man isn't dead yet. It's not a perma-

nent situation. He could change. There are things that could be done. *** Nothing is carved in granite; and therefore to make a gift program to permanently divest yourself of something and no longer have it at that low of a level of estate evaluation is not prudent in my judgment." Tempkin explained, "Your gift is permanent, but *** his circumstances [are] not permanent ***."

The guardian *ad litem* failed to challenge the petition requesting the $30,000 gift or present any evidence in the incompetent's interest. Gelderman testified, "The burden of proof is not on me. They had to sustain the allegations of the petition. I introduced no evidence." Gelderman testified that it was not common to request the disbursement of $30,000 in a lump sum from an incompetent's estate. Gelderman believed there was probably some testimony offered regarding what the tax advantages would be, but he could not recall who testified or what the testimony reported.

Petitioner was 46 years old when the $30,000 gift was made in 1973, and he had an actuarial life expectancy of 22 more years. Estate taxes, then, were not an immediate concern. (*Cf., e.g., In re duPont* (1963), 41 Del. Ch. 300, 194 A.2d 309 (permanently disabled 86-year-old ward's conservator allowed to disburse $36 million to prospective heirs of ward in order to achieve a $16 million tax savings).) There was no evidence, *e.g.*, of medical testimony, regarding petitioner's life expectancy or medical needs or condition. There was no medical testimony to support the court's finding that the "prognosis is that he will remain incompetent during the remainder of his life." (See *In re Guardianship of Christiansen* (1967), 248 Cal. App. 2d 398, 56 Cal. Rptr. 505 (requiring competent medical testimony, and in the absence of that, barring transfer for tax savings alone).) Moreover, there was no evidence regarding the value $30,000 would be worth 22 years later if invested rather than given to daughters. For example, at the rate of 15%, if earned interest were compounded annually, the $30,000 would be worth $649,342. Even in a 5% savings account, with the interests compounded annually, the $30,000 would be worth $87,757 in 22 years. There was also no evidence as to how much tax would have been saved by making the gift. We conclude that the trial court erred in overruling petitioner's objection to the $30,000 gift.

Respondents urge this court to adopt the doctrine of substituted judgment.

Some jurisdictions authorize making allowances out of an incompetent's estate for the benefit of relatives on the basis of general application of this doctrine. (See generally Annot., 24 A.L.R.3d 863,

871 (1969).) The doctrine provides that the court or guardian may use the incompetent's funds for the benefit of his relatives based on findings as to what the incompetent himself would have done, if competent. (Annot., 24 A.L.R.3d 863 (1969); *In re Guardianship of Christiansen* (1967), 248 Cal. App. 2d 398, 56 Cal. Rptr. 505.) This doctrine has been neither rejected nor adopted by Illinois.

We need not determine whether Illinois should adopt this doctrine. Under the circumstances presented here, the necessary elements to support the doctrine are missing. The leading decision setting forth the doctrine of substituted judgment is *In re Guardianship of Christiansen.* The court set forth four relevant factors for the criteria for authorization: permanence of condition; needs of the ward; devolution of the property; and donative intent. 248 Cal. App. 2d at 425-28, 56 Cal Rptr. at 523-25.

In regard to the permanency of petitioner's mental condition, Seidmon "had always understood *** that he would not get better." The basis of her understanding was "[w]hat different doctors told us through the years." She could not recall the doctors' names.

Deborah testified that when she first spoke with Dr. McCullough, the doctor "hoped that he could stabilize" the ward. "When he first met my father, he was pessimistic to that. He hoped that it would be—he was making no promises."

"QUESTION: Do I take it that Dr. McCullough advised you that your father would not ever recover?

DEBORAH: He said he did not know."

Dr. McCullough testified that when he initially examined petitioner, he "[c]ould not tell at that time" whether his condition was permanent. "Now, in general the rule of thumb is that if a patient has been seriously psychiatrically ill for two years or more, that the tendency for the condition to remain rather chronic throughout lifetime is much, much greater than if the condition has been present for less than two years. So the *** seven year period was of concern to us."

After the first evaluation, what Dr. McCullough "basically told the family was that I really couldn't tell but that we were going to give it our best shot ***." He then began a course of antidepressant medication. Petitioner showed a "significant response to the medication" in about the sixth week of hospitalization in fall 1976. However, "it was still unclear as to the extent of what the improvement might be." The improvement was in steps. "So it was steady upward progression, but there were intermittent, or problem or crisis times." Dr. McCullough testified that there was never a time when he was of the opinion that

petitioner's condition was irreversible.

Dr. McCullough also testified that "except for perhaps the first couple of months in the hospital and the first admission he was fairly rational throughout the whole time." Dr. McCullough continued, "his thought processes were intact. He was able to assess reality, and utilize appropriate judgment and conduct himself accordingly." Theoretically, petitioner was "restorable around" the beginning of 1979. Dr. McCullough and petitioner spoke of his possible restoration for "probably a year prior" to his restoration in June 1980.

Under these facts, we find that as a matter of law there was insufficient evidence of permanency of the mental disability of this still relatively young man. The trial court finding to the contrary was against the manifest weight of the evidence. In addition, we have already discussed the absence of donative intent shown in any preincompetency gift-giving pattern. We conclude that the doctrine of substituted judgment could not be applied here, and thus we need not decide whether Illinois should adopt the doctrine.

In case No. 84—204, Maryland Casualty Company, the surety for the original conservator, and Sheila Seidmon, the executrix for the estate of the original conservator, contend that the trial court abused its discretion in denying the original conservator's petition for fees. The original conservator acted for 10 years but sought no fees. Maryland Casualty, however, caused the conservator's executrix to seek fees on behalf of the estate in the amount of $1,000 per year for 10 years. In December 1983, the trial court denied the petition of the conservator's executor for fees.

A representative is entitled to reasonable compensation for his services. (Ill. Rev. Stat. 1983, ch. 110½, par. 27—1.) The decision as to what constitutes reasonable compensation is a matter peculiarly within the discretion of the trial court, and each decision must be based on the circumstances of the particular case. (*In re Estate of Rumoro* (1980), 90 Ill. App. 3d 383, 413 N.E.2d 70.) In addition to other factors, the court may consider the good faith, diligence and reasonable prudence used by the conservator. (*In re Estate of Rumoro* (1980), 90 Ill. App. 3d 383, 413 N.E.2d 70.) Compensation will not be allowed where there was a failure to exercise reasonable diligence for the benefit of the estate. (See *Edwards v. Lane* (1928), 331 Ill. 442, 163 N.E. 460.) A reviewing court will not alter the trial court's determination as to compensation, unless the decision is manifestly erroneous. *In re Estate of Minsky* (1978), 59 Ill. App. 3d 974, 376 N.E.2d 647.

We have found that the trial court properly surcharged many

large expenditures wrongfully made by the conservator and that the conservator's conduct constituted constructive fraud. As a fiduciary, the conservator owes a duty of good faith toward the estate and will not be compensated for neglect or dereliction of duty. (*Nonnast v. Northern Trust Co.* (1940), 374 Ill. 248, 29 N.E.2d 251; *In re Estate of Minsky* (1978), 59 Ill. App. 3d 974, 376 N.E.2d 647.) Because the services rendered by the conservator were not in the interest of the estate, we cannot say the trial court decision to deny all conservator fees was manifestly erroneous.

In case No. 84—1502, the daughters contend that the trial court erred in entering summary judgment in favor of Maryland Casualty Company on the subrogation counts. In a third-party complaint for indemnity which was directed against petitioner's two daughters individually and on behalf of their minor children (the children), Maryland Casualty sought to be indemnified by the original conservator's executrix, heirs and assigns for losses Maryland Casualty sustained as the surety on the conservator's bond.

 A surety on the bond of a conservator for an incompetent may be held liable for monies owed by the conservator. (See, *e.g.*, *People ex rel. Miller v. Myer* (1964), 46 Ill. App. 2d 106, 196 N.E.2d 370; *People ex rel. Cockrum v. Southern Surety Co.* (1926), 241 Ill. App. 384.) Maryland Casualty filed a third-party complaint for indemnity against the original conservator's executor, heirs and assigns, and against the respondent daughters, both individually and on behalf of their minor children. Maryland sought damages for losses suffered as a result of its role as surety on the conservator's bond; for money had and received (assumpsit); and for a constructive trust of monies wrongfully transferred from petitioner's estate. The trial court granted Maryland Casualty's motion for summary judgment.

 Respondents argue that they are innocent recipients of the disbursements and the surety's action for contractual indemnity is against the conservator, not the respondent daughters. Respondents contend further that no constructive trust exists here because Maryland failed to plead facts regarding the daughters' unfair or illegal holding of property. (See *LaBarbera v. LaBarbera* (1983), 116 Ill. App. 3d 959, 452 N.E.2d 684.) Respondents also assert that Maryland failed to plead facts showing fraud or the breach of a fiduciary duty. Respondents further argue that Maryland has no standing because it is not a party aggrieved. (*Anchor Realty & Investment Co. v. Rafferty* (1941), 308 Ill. App. 484, 32 N.E.2d 394.) However, standing is based on the concept of equitable subrogation. (*American National Bank & Trust Co. v. Weyerhauser Co.* (7th Cir. 1982), 692 F.2d 455; *Dworak*

*ex rel. Allstate Insurance Co. v. Tempel* (1959), 17 Ill. 2d 181, 161 N.E.2d 258.) Maryland has a claim against persons who wrongfully came into possession of the estate's assets. It stands in the shoes of the insured party, petitioner. (See generally A. Stearns, The Law of Suretyship 451-52 (5th ed. 1951).) We have held that the daughters wrongfully came into possession of the estate's assets. Thus, Maryland could properly bring an action against respondents.

■■■ Respondents next argue that Maryland's liability in the underlying cause was "contingent and conditional" because it had not yet sustained a loss. A surety's right to subrogation does not accrue until it has actually paid the debt. (*Village of Crainville v. Argonaut Insurance Co.* (1980), 81 Ill. 2d 399, 410 N.E.2d 5.) Petitioner's estate accepted the surety's appeal bond as satisfaction of the conservator's debt, and thus the requirement of actual payment was met. (See generally A. Stearns, The Law of Suretyship 193, 517 (5th ed. 1951).) Moreover, a defendant may file a third-party complaint against a person "who is or may be liable to him or her for all or part of the plaintiff's claim against him or her." Ill. Rev. Stat. 1983, ch. 110, par. 2—406(b).

Respondents also contend that summary judgment was improper because material issues of fact remain as to Maryland's right to recover. Respondents argue that Maryland failed to show it had a right to recover the property superior to respondents' rights. They cite the principle that a constructive trust must include an allegation of fraud, yet respondents were "innocent with respect to their receipts" from the estate. The trial court ordered the conservators to pay the estate monies surcharged. The court also ordered that, to the extent such repayments were not made by the conservators, their respective sureties "shall pay said sums plus interest in accordance with the obligations of their respective bonds."

■■■ Initially we note that innocence is not relevant as a defense to an action for money had and received. Where the money should not have been paid, it can be recovered notwithstanding the facts that the person to whom it was paid acted fairly and in good faith. *M. J. McCarthy Motor Sales Co. v. Van C. Argiris & Co.* (1979), 78 Ill. App. 3d 725, 396 N.E.2d 1253.

Moreover, in a citation proceeding, the court orders a citation to issue for the appearance before it of any person whom the petitioner believes even has "in his possession or control any personal property, books of account, papers or evidences of debt or title to lands which belonged to a person whose estate is being administered in [the] court or which belongs to his estate ***." (Ill. Rev. Stat. 1977 through

1979, ch. 110½, par. 16—1.) Thus, the innocence of respondents and their children is not relevant.

The equities of the surety are superior to those of the third party in order for the loss to be shifted to the third party. (*American Surety Co. v. Morton* (E.D. Ill. 1961), 200 F. Supp. 82, *aff'd* (7th Cir. 1962), 311 F.2d 222.) Maryland has been equitably subrogated to the rights of the estate and therefore it is the party to whom the funds must be returned. (See *Moore v. Topliff* (1883), 107 Ill. 241, 249 (function of equitable subrogation is that surety who answers debt of principal is entitled to assert all claims the creditor would have asserted).) An order of the probate court on the final account which showed the amount due the ward is conclusive against the guardian and his sureties in a suit on the bond. *Ryan v. People* (1896), 165 Ill. 143, 46 N.E. 206.

Respondents argue further that the trial court lacked jurisdiction because a notice of appeal had been filed in the underlying action, which had the same subject matter. A trial court may hear matters purely collateral or supplemental to the appeal, and thus retains jurisdiction to hear matters independent of the issues in the appeal. (*In re Marriage of Giammerino* (1981), 94 Ill. App. 3d 1058, 419 N.E.2d 598.) In this case, the trial court retained jurisdiction over Maryland's right to subrogation, as that right did not arise until after judgment was entered in the underlying cause. Moreover, the claims differ. The underlying cause concerns wrongful distribution of property; and the subrogation claims concern the question of which party will ultimately bear the loss, an issue not included in the underlying action. The trial court properly heard Maryland's action.

No genuine issue of material fact remains. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005.) As a matter of law, the trial court properly entered summary judgment in favor of Maryland Casualty.

Respondents also argue that the trial court erred in barring the testimony of Morton Swift, who audited eight of Efron's current annual accounts. Swift filed a motion to quash the subpoena seeking his testimony and production of all books and records and tax returns for 1969 through 1979 pertaining to petitioner. Swift relied upon section 27 of the Illinois Public Accounting Act (Ill. Rev. Stat. 1981, ch. 111, par. 5533), which provides that a public accountant shall not be required by any court to divulge information or evidence obtained by him in his confidential capacity as a public accountant. On May 30, 1983, the trial court granted the motion to quash the subpoena. The statute, however, protects only the information which the accountant

received in confidence from the client. (*In re October 1985 Grand Jury No. 746* (1987), 154 Ill. App. 3d 288, 507 N.E.2d 6, *appeal allowed* (1987), 116 Ill. 2d 558.) Here, the information given to the accountant was in connection with his preparation of audits of accounts which were filed in court and thus public records. However, the trial court error in excluding this evidence was harmless. The conservator's ultimate responsibility would not be altered by the fact that he may have been advised by an accountant. Moreover, at the time the $3,000 payments were made, the court was not even informed that they were gifts. Instead, the conservator reported the payments as living expenses.

■ Respondents also argue that upon his restoration to competency, the former incompetent ratified obligations or expenditures which were not binding against him because of no prior approval by the court. (See generally Annot., 63 A.L.R.3d 780 §11 (1975).) On October 1, 1980, petitioner met with the successor conservator, Swift and his attorney to review the accounts. Respondents rely on the fact that petitioner voiced no objections to the accounts at that time. This silence did not constitute ratification. Petitioner was entitled to consider the accounts further before filing any written objections to the final accounts, which were not filed until the following year.

■ Finally, respondents argue that petitioner was competent to give valid consents to the transfer of the estate's assets during lucid intervals. Respondents contend it was error to prevent them from questioning petitioner about such consents. We agree that application of section 8—201 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 8—201) was inappropriate, since at trial petitioner was not a "person under legal disability" as defined in the Dead Man's Act. Instead, he was filing the objections himself, not through a representative. The error, however, was harmless because, notwithstanding these lucid intervals, petitioner remained legally incompetent throughout the 10-year period. The purpose of the incompetency statute is to protect the incompetent's property, since by definition he is incapable of managing his own affairs. (Ill. Rev. Stat. 1979 through 1981, ch. 110½, par. 11a—2; Ill. Rev. Stat. 1977, ch. 110½, par. 11—2; Ill. Rev. Stat. 1969 through 1975, ch. 3, par. 112.) Thus, any purported consent petitioner gave to the transfer of his assets during the incompetency was ineffective. See *In re Estate of Spengler* (1973), 12 Ill. App. 3d 30, 297 N.E.2d 401.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed only as to the $30,000 gift and affirmed as to all other aspects of the case. The cause is remanded with directions

to enter an order surcharging the conservator's estate for the $30,000 gift.

Judgment affirmed in part; reversed in part and remanded with directions.

WHITE, J., concurs.

JUSTICE RIZZI, concurring in part and dissenting in part:

I initially address the majority's conclusion that the doctrine of substituted judgment is not applicable to this appeal. I respectfully disagree with the majority's conclusion.

The origin of the doctrine of substituted judgment has been traced back to a 19th century English case, *Ex parte Whitbred, in the Matter of Hinde,* 2 Merivale 99, 35 Eng. Rep. 878 (1816). In *Whitbred,* it was recognized that the chancellor could, under proper circumstances, grant to needy relatives part of an incompetent's surplus income. Such payments were to be determined according to what the incompetent would probably have paid had he been of sound mind. In more modern times, the California courts have interpreted and expanded the concept of substituted judgment. In the leading case of *In re Guardianship of Christiansen* (1967), 248 Cal. App. 2d 398, 56 Cal. Rptr. 505, the California court of appeals determined that under the California probate statutes, the probate court had the power to consider matters affecting the estate of the incompetent which were not expressly covered by the statutory scheme. (248 Cal. App. 2d at 408-13, 56 Cal. Rptr. at 512-15.) The *Christiansen* court determined that the probate courts had the power and authority to decide whether to authorize transfers of the property of the incompetent for the purpose of avoiding unnecessary estate or inheritance taxes or expenses of administration, and to authorize such action where it appeared from all of the circumstances that the incompetent, if sane, as a reasonably prudent man, would so plan his estate, there being no substantial evidence of a contrary intent. 248 Cal. App. 2d at 424, 56 Cal. Rptr. at 522-23.

In determining whether to authorize transfers from an incompetent's estate under the doctrine of substituted judgment, the *Christiansen* court recognized four main criteria. First, a court should consider the permanence of the incompetent's condition. (248 Cal. App. 2d at 424-25, 56 Cal. Rptr. at 523.) Since it had been established that Christiansen's condition was considered permanent, the court declined to consider whether the condition rendering the ward incompetent is

a prerequisite to the invocation of the substituted judgment doctrine. The second factor to be considered by a court is the needs of the ward. The *Christiansen* court stressed that there could be no transfers from an incompetent's estate for any purpose until the needs and obligations of the ward had been satisfied. (248 Cal. App. 2d at 425, 56 Cal. Rptr. at 523-24.) The third factor which must be explored is the incompetent's intended devolution of his property. In regard to this factor, the *Christiansen* court observed that "[s]ince on recovery the incompetent would be free to make or change his will, no transfers should be authorized for tax saving purposes alone unless there is no probability of this eventuality." (248 Cal. App. 2d at 426, 56 Cal. Rptr. at 524.) The final factor contemplated by the court involved donative intent. Here, although not requiring a showing of former practice or conduct, the court stated that there must be some showing of a relationship and intimacy between the incompetent and the prospective donees in order to establish that they would be the objects of the incompetent's bounty by any objective test. 248 Cal. App. 2d at 425, 56 Cal. Rptr. at 523-24.

In legislation effective January 1, 1981, the California legislature codified that court-recognized doctrine of substituted judgment. (See Cal. Prob. Code §2580 *et seq.* (West Supp. 1988).) Pursuant to the California statute, a conservator or other interested persons may petition the court to take proposed action for the purpose of (1) benefitting the conservatee or the estate, (2) minimizing current or prospective taxes or expenses of administration of the conservatorship estate or of the estate upon the death of the conservatee, or (3) providing gifts for such purposes, and to such charities, relatives, friends, or other objects of bounty, as would be likely beneficiaries of gifts from the conservatee. (Cal. Prob. Code §2580 (a)(1), (a)(2), (a)(3) (West Supp. 1988).) Similar provisions are found in Massachusetts, Pennsylvania and the Uniform Probate Code. (See Cal. Prob. Code §2580 (West Supp. 1988), Law Revision Commission Comment, 1979 Addition.) The California statutory scheme further provides that notice of the conservator's petition must be given to certain persons. (Cal. Prob. Code §2581 (West).) Consistent with *Christiansen*, where an incompetent opposes the proposed action, the court shall allow the exercise of substituted judgment for the incompetent. Also, the court must determine that the proposed action will not adversely affect the estate, so that the estate remaining after the action is taken is sufficient to provide for the needs of the conservatee and those people entitled to support, maintenance and education by the conservatee. (Cal. Prob. Code §2582 (West).) Finally, the California statute states with particularity

the general criteria recognized by *Christiansen* as being relevant to a determination as to whether a proposed action concerning a conservatee's estate should be authorized. Cal. Prob. Code §2583 (West).

I believe that *Christiansen* and the statutory scheme concerning substituted judgment enacted in California following that decision provide a framework for recognition of the doctrine of substituted judgment here in Illinois. I further believe that recognition of this doctrine represents an important step forward in regard to the administration of incompetents' estates since it permits a court to authorize actions which it deems, after considering all of the relevant criteria, consistent with the concerns and wishes of the incompetent, were he of sound mind. Thus, rather than requiring a court to adhere to a rigid method of dealing with incompetents and their estates as though all incompetents dwell in a vacuum, the doctrine acknowledges that the past actions and desires of an incompetent should not be inexorably ignored. The doctrine provides a careful balance between protecting the incompetent's estate and providing for the continuation of the actions and desires of the incompetent, as exhibited by the incompetent while still of sound mind.

Although neither the Illinois Probate Act nor the Illinois Probate Act of 1975 has a provision which specifically concerns substituted judgment, I believe that the provisions of these Acts are such that they are broad enough to encompass that concept. Both Probate Acts specify that they are to be liberally construed. Both Acts refer to the conservator's duty to apply the income and principal of the incompetent's estate "for the comfort and *suitable* support and education of the ward [and] his children." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 110½, par. 11—13(b); Ill. Rev. Stat. 1979, ch. 110½, par. 11a—18; Ill. Rev. Stat. 1969-1975, ch. 3, par. 122.) Thus, I believe that the legislature clearly contemplated that disbursements from the incompetent's estate should not be limited to providing for "bare bones" necessities, but rather, should be permitted where the court is reasonably convinced that disbursements sought by the conservator are consistent with what it appears that the incompetent would have done if he were still competent. In this regard, I believe that it would be as unfair to an incompetent to preclude disbursements from his estate to benefit his loved ones and the causes which he supported as it would be to make disbursements which subsequently turn out not to have been in keeping with the incompetent's apparent wishes. The substituted judgment doctrine necessarily involves the inherent risk that court-authorized disbursements will not accurately reflect the amount or type of disbursements which the incompetent, if of sound

mind, would have made himself. However, where a court has properly considered the relevant criteria, I do not believe that it is any worse to err on the side of generosity, as apparently occurred here, as to err on the side of parsimony.

In examining the disbursements made from Berger's estate in light of the substituted judgment doctrine, I agree with the *Christiansen* court that the test as to whether such disbursements should have been authorized does not require evidence of past conduct or practice (*Christiansen*, 248 Cal. App. 2d at 420, 56 Cal. Rptr. at 520), nor is subjective intent the sole consideration (*Christiansen*, 248 Cal. App. 2d at 422, 56 Cal. Rptr. at 521). Rather, the governing standard should be whether the conservator was authorized to act as a reasonable and prudent man would act under the same circumstances, unless there is evidence of any settled intention of the incompetent, formed while he was still of sound mind, to the contrary.

While I believe that California's comprehensive statutory scheme regarding substituted judgment should be considered in future cases concerning the administration of incompetents' estates, I recognize that some of the provisions cannot be considered here due to the current posture of this case. I therefore turn to the *Christiansen* criteria for invocation of the substituted judgment doctrine, as I believe that it is appropriate to apply the criteria set forth in that case to the circumstances here.

Initially, I believe that it is critical to point out that Berger's estate was always more than sufficient to cover Berger's needs during Berger's incompetency. The record shows that Berger's estate more than doubled during the period of Berger's incompetency, increasing from approximately $143,000 to $387,000, despite the disbursements to which Berger now objects. Furthermore, all of the transfers were made from surplus income; the principal remained untouched.

Next, I direct my attention to the perceived permanence of Berger's incompetence. Clearly, modern medicine has not yet progressed to the point where the diagnosis and treatment of mental illness can be considered precise. Moreover, I do not believe that permanence of incompetence is necessarily required in all instances for the doctrine of substituted judgment to be invoked. Nevertheless, the record here shows that there was sufficient evidence to support the conclusion that Efron, during most of his tenure as conservator, reasonably believed that Berger's condition was permanent. Efron was aware of Berger's history of mental problems, he was closely involved with Berger's care, and he was kept well apprised of Berger's condition. I recognize that some of the testimony relating to Efron's knowledge of

the extent of Berger's problems is set forth in various offers of proof, as the trial court refused to admit the testimony on the basis of Berger's hearsay objections. However, I agree with respondents that the hearsay objections to this testimony should not have been sustained and that the testimony was improperly excluded. The testimony was not offered to establish that Berger's condition was, in fact, permanent. Rather, it was presented to show that Efron reasonably believed that Berger's condition was permanent and that he acted accordingly with regard to the doctrine of substituted judgment. See *In re Estate of Chronholm* (1962), 38 Ill. App. 2d 141, 155, 186 N.E.2d 534, 541.

When the improperly excluded evidence is considered with the other evidence, the record shows that Berger had a history of mental illness, and, in fact, his incompetency lasted for 10 years, a significant length of time. Various forms of treatment were tried without success. The VA hospital in Kansas determined that Berger would not benefit from further hospitalization, and therefore Berger was transferred to a custodial care facility. Emma Hope, who worked at Fellowship House while Berger was there, testified that she would not have recognized Berger now because he looked like a million dollars compared to how he appeared when she first met him. Dr. McCullough, who was eventually responsible for Berger's recovery, testified that Berger was suffering from severe agitated depression, and that, as a general rule, where a patient has been seriously psychiatrically ill for two or more years, the tendency for the condition to remain chronic throughout his lifetime is much greater than if the condition had been present for less than two years. Since Berger had been incompetent for seven years prior to the time that McCullough first met him, the length of the illness supported the perception that Berger's problems were permanent. Respondents testified that McCullough had indicated to them that he was pessimistic about Berger's chances for recovery. McCullough also testified that the staff at the halfway house in Evanston where Berger resided from October 1975 to May 1976 had been concerned about possible suicidal thoughts expressed by Berger. Moreover, in 1976, Berger's attempt to reside in a hotel failed when the severity of his problems increased, and he had to be hospitalized once again. Jessie Squire, who owned and operated Arlington House where Berger went to reside in 1976 following one of his numerous hospitalizations, testified that there were questions as to whether Berger was a proper guest for Arlington House, which was only a residential facility, due to Berger's psychiatric problems. Accordingly, in view of the length and seriousness of Berger's mental illness, I be-

lieve a determination that Berger's incompetency was likely to be permanent was reasonable.

The third *Christiansen* criterion which must be addressed is that of Berger's intended disposition of his property upon his death. Here, there is no question but that at the time Berger was declared incompetent, his daughters, Deborah and Gloria, were the sole objects of his affection and the natural objects of his bounty. Berger's will, executed prior to his incompetency, generally provided that his property should go to his children if his wife, Janice, should predecease him. Berger did not meet his present wife, Florence, until approximately six months prior to the time that he was restored to competency. Thus, the transfer of monies from Berger's estate to Deborah and Gloria clearly did not interfere with Berger's proposed disposition of his estate upon his death.

For similar reasons, I believe that the final *Christiansen* factor, relating to donative intent, is established by the record. There was more than adequate testimony from which a close relationship between Berger and his daughters, both before and during Berger's incompetency, could be inferred. Deborah and Gloria testified regarding the closeness of the family unit and the generous gifts and extremely comfortable lifestyle which their parents provided. They also testified regarding their continuing involvement with their father during his incompetency. Berger's testimony did not directly contradict respondents' testimony on these matters, nor did Berger claim that he was a distant or uninvolved father, or that his support of his family was limited to the necessities of life.

I therefore believe that the record shows the presence of the criteria necessary to warrant application of the doctrine of substituted judgment and that the doctrine should have been considered in this case. However, despite my general conclusion to this effect, I believe that each individual disbursement disallowed by the trial court must be scrutinized in order to determine whether it should have been permitted under the doctrine of substituted judgment.

One of the objections made by Berger was that funds from his estate should not have been used to pay for Deborah's tuition to the National College of Education for a graduate degree. The trial court surcharged these funds against the conservator, finding that these disbursements were wrongful because at the time that they were made, Deborah was "an adult, married and emancipated and not otherwise dependent upon the ward for support." I believe that the trial court erred in finding these disbursements wrongful, and I further believe that the majority has erroneously reached the same result.

The statutes provide that in managing the ward's estate, the conservator shall provide *"suitable* support and *education"* for the ward's children. Thus, I do not believe that the mere existence of the factors relied on by the court to disallow these educational expenses mandate a finding that the disbursements were improper, especially when viewed in light of the substituted judgment doctrine. In families where education is made a high priority, it is not unusual for a parent to continue to pay for a child's education even after the child reaches maturity and/or is married. Here, the education expenses were set forth in the sixth through the ninth current accounts approved by the probate court. Efron, who was the conservator at the time of these expenditures, knew Berger intimately, since he was Berger's father-in-law and his employer for more than 21 years. Berger did not object to any disbursements made in relation to his daughters' undergraduate degrees. Under these circumstances, I conclude that the doctrine of substituted judgment should be applied to the expenditures for Deborah's education and that amounts distributed from Berger's estate for the purpose of Deborah's advanced education should not be surcharged against the conservator.

For similar reasons, I believe that the trial court erred in surcharging certain gasoline and automobile expenses against the conservator. Gloria's testimony indicates that these expenses were related to field placement work that she did in connection with her college education and to driving between her home and her college. Since these expenses were college related, they should not have been disallowed.

The next category of disbursements which I address involves vacations taken by Gloria and Deborah. The trial court determined that these vacations involved pleasure trips, which were not supportable as gifts. The majority agrees with the conclusion of the trial court. I disagree.

The vacations included trips to Miami, Florida, and a trip to Europe. The trips to Florida involved visits to Efron, the conservator and Deborah and Gloria's grandfather, who spent much of his time in Florida. While there was no history of family trips to Florida prior to Berger's incompetency, Gloria and Deborah did testify that when they were growing up they went every summer to South Haven, Michigan, where their father and Efron had homes. Thus, the close relationship between the girls and their grandfather and their pattern of spending time with him are shown by the record. The fact that the vacations challenged here involved trips to Florida rather than Michigan is not determinative of the propriety of the disbursements. It must be remembered that Gloria and Deborah had lost their mother and that

their father, Berger, was declared incompetent soon thereafter. A reasonable person could have believed, under the doctrine of substituted judgment, that these vacations by Deborah and her husband and Gloria to visit their grandfather would have been in keeping with Berger's desire to foster the family unit. In regard to the European vacation, there was testimony that Berger and his wife had promised such a vacation to their daughters. While I agree with Berger that this trip clearly did not constitute a necessity (see *McKanna v. Merry* (1871), 61 Ill. 177, 178), I nevertheless conclude that where the court was apprised of the vacation, and there was no fraud, mistake or accident, the conservator should not be surcharged for the cost of the trip.

The next items to be considered are certain items of clothing which the trial court disallowed and surcharged to the conservator. Contrary to the finding of the majority, I believe that the record shows that these items were not really different in kind from the type of clothing which the girls were accustomed to receiving from their parents. Therefore, these items should not be surcharged against the conservator. For similar reasons, I do not believe that expenditures on gifts for birthdays, anniversaries, and for Berger's grandchildren, as well as for other family-related events, should be surcharged against the conservator. The testimony of Gloria and Deborah showed that their parents did give them rather lavish gifts, including jewelry and a fur jacket, for special occasions. Obviously, there could not have been any established pattern for anniversary gifts or gifts for grandchildren since Berger was adjudicated incompetent before Deborah and Gloria celebrated their first anniversaries or had any children. Here, there was an established pattern of gift giving prior to Berger's incompetence which evidenced a donative intent on Berger's part toward his daughters. Under the doctrine of substituted judgment, extension of the established pattern to anniversaries, grandchildren and other family-related events was not improper.

However, while I do agree with my colleagues' determination that the charitable contributions made by Efron and reflected in the conservator's eighth, ninth and final accounts cannot be upheld, I base my agreement on different reasoning. There was simply no evidence at trial as to any charitable contributions made by Berger and no evidence of his particular interest in the charity to which funds from his estate were donated. While no one disputes the worthiness of the charity, and respondents point out that the contributions were not excessive, these factors are clearly insufficient to bring the charitable gifts within the ambit of the substituted judgment doctrine. Accord-

ingly, I believe that the charitable contributions cannot be upheld under the doctrine of substituted judgment and the trial court properly surcharged the conservator for these donations.

I likewise am in accord with the majority's determination that the trial court correctly disallowed (1) any support payments made to Gloria prior to her marriage which were in excess of $400 and (2) all of the support payments made to Gloria following her marriage. I, however, reach the same conclusion as the majority through my application of the doctrine of substituted judgment to this issue. In the present case, the 1971 order for support expired by its terms when Gloria graduated, and there is no justification in the record for continuing support payments to Gloria which were initially linked to her education after the time that Gloria completed her education and married Philip Roth. I am unable to conclude that a reasonable person would have believed that Berger would have continued the substantial payments at issue here once Gloria had her degree and was married. I also conclude, as my colleagues do, that the conservator's unilateral decision to increase the monthly payments without court approval cannot be sanctioned. The payments were increased first by 50% and then by 100% from the original court-ordered payment. Such unapproved increases cannot be validated on the basis of increased inflation alone. Therefore, the trial court properly surcharged the conservator and the successor conservator for the wrongful support payments attributable to them.

The final monies which Berger claims were improperly disbursed from his account involve annual payments of $3,000 to both Gloria and Deborah, which began in 1973. Ostensibly, the purpose of these disbursements was to reduce estate and/or inheritance taxes. While I believe that minimization of taxes is a valid consideration in regard to the application of the substituted judgment doctrine, I do not believe that the manner in which these disbursements were accomplished here can be legitimized under that doctrine. The trial court found that all of these annual payments were gifts. It held that these payments were improper and should be charged against the conservator and the successor conservator. I agree.

There is no indication in the record that at the time the court approved the annual accounts which reflected the $3,000 payouts it was aware of what respondents now claim was the "actual" purpose of the payouts, namely, to reduce estate and/or inheritance taxes. Additionally, at some point in the late 1970s, it must have become apparent that Berger's condition was markedly improved. In fact, Dr. McCullough testified that Berger would have been restorable during

1979. Also, Berger was only in his mid-fifties at this time. I believe that the "permanence of condition" factor is particularly critical where gifts from an incompetent's estate are made solely to reduce prospective estate or inheritance taxes. Since Berger's evident change in condition negated whatever reasonable beliefs there might have been earlier that his condition was permanent, the fact that the $3,000 disbursements were appropriately listed as gifts rather than as living expenses in the later current accounts cannot serve to justify application of the substituted judgment doctrine to these disbursements.

I next address the question, raised in Berger's cross-appeal, of whether the trial court erred in denying Berger's objections to the $15,000 payouts made to Deborah and Gloria in 1973 as a lifetime gift tax exclusion. The trial court found that Berger's objections were untimely because the gifts had been allowed in an order entered in 1973. The trial court determined that since the order was final and appealable in 1973, Berger should have objected to these gifts by way of a motion pursuant to section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1401), which he would have had to file within two years of his restoration. I agree with the majority's conclusion that the trial court erred in precluding Berger from objecting to the payments. Although the $15,000 payments were approved in a separate court order, they were also included in the annual account for that period, as was proper. Thus, Berger had the right to object to the payments as part of his objections to the current and final accounts.

I, however, disagree with my colleagues' determination that the trial court erred in overruling Berger's objection to the two $15,000 payments. The record shows that Efron had petitioned the court for permission to make these distributions, and in the petition he explained to the court the reasons for the request. The court entered an order authorizing the request. While Berger argues that the guardian *ad litem* failed to properly contest this disbursement at the time of the conservator's petition, this allegation is insufficient to show that the order was improper or that there was fraud, accident or mistake in regard to the approval of the current account in which the payout appears.

In addition, at the time that these funds were disbursed, all of the elements required to apply the doctrine of substituted judgment were present. I disagree with Berger's argument that the evidence presented to the trial court here demonstrated that this large cash gift, made in 1973, was inappropriate because Berger was not incurably ill

and had a long life expectancy. Hindsight alone cannot serve to invalidate the gift. Berger's will shows that he was concerned about estate and inheritance taxes. Thus, it would have been reasonable to assume that he was also concerned about gift taxes. In 1973, there was no apparent improvement in Berger's condition and virtually no hope for his restoration. The fact that Berger eventually returned to competency cannot be used to retroactively invalidate the use of the doctrine of substituted judgment where it was properly exercised at the time of the distribution. I therefore conclude that the trial court's order upholding the $15,000 gifts was correct, even though the court's reasoning was erroneous. See *Long v. Soderquist* (1984), 126 Ill. App. 3d 1059, 1062, 467 N.E.2d 1153, 1155.

Since I believe that the trial court correctly upheld some of Berger's objections, I now consider respondents' argument that Berger approved and ratified the handling of his estate following his restoration. I, like my colleagues, cannot say that Berger ratified the disbursements at issue here following his restoration. With regard to Berger's failure to object to the accounts at the time of the October 2 meeting, I likewise agree that Berger was entitled to consider the accounts further before deciding whether they should be challenged. Berger's failure to voice an objection at that time was not sufficient to preclude Berger from filing his objections at a later date. In addition, although Berger's decision not to file a claim against Efron's estate may be deemed unfair, he clearly had the right to choose not to do so. Accordingly, I agree that respondents' ratification argument was properly rejected.

Next, I address whether the trial court was correct in ordering the return of certain personal property to Berger. Among the property which was contested were three bank accounts: (1) Liberty Savings & Loan Assn., account No. S53787—7 (in the names of Berger and Deborah); Liberty Savings & Loan Assn., account No. S29514—7 (in the names of Berger and Gloria); and (3) Devon Bank, account No. 74568 (in the names of Berger and Deborah). I disagree with the majority's resolution of this issue. I believe that the trial court improperly ordered Deborah and Gloria to return the funds in these accounts to Berger.

At the time of the first annual account, the court was advised that the funds in these accounts belonged to the daughters. While Berger complains that the guardian *ad litem* failed to adequately protect his interest in regard to these accounts, Berger's dissatisfaction is insufficient to warrant a return of the funds. Moreover, at trial, Berger merely testified that he set up these accounts in order to pro-

tect himself in the event of his wife's death. The record shows, however, that one of the accounts was set up in 1962, approximately seven years prior to the death of Janice. In regard to the Devon Bank account, Berger testified that he had no recollection of this account. In contrast, Gloria and Deborah gave plausible explanations for the manner in which they had accumulated the funds in the accounts. Under these circumstances, I cannot say that there was any fraud, mistake or accident shown in regard to the initial determination that these accounts belonged to Deborah and Gloria. Therefore, I believe that the trial court erred in ordering that the funds which were in these accounts be returned to Berger.

However, I do agree with my colleagues' determination that the trial court's finding that Berger had never made a gift of certain personal and household property to his children was correct.

I also agree with the majority's conclusion regarding respondents' argument that Berger, while experiencing lucid intervals during his incompetency, gave valid consent to the transfer of all the personal property and the monies to which he now objects.

I next address respondents' argument that the trial court should not have entered summary judgment in favor of Maryland Casualty on the subrogation counts for money had and received and for a constructive trust because the pleadings disclose material issues of fact in regard to Maryland Casualty's right to recover. A motion for summary judgment is to be granted if the pleadings, depositions and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005.) Since summary judgment is a drastic method for disposing of cases, it should be allowed only where the movant's right to such a judgment is clear and free from doubt. (*Ainsworth Corp. v. Cenco, Inc.* (1982), 107 Ill. App. 3d 435, 438, 437 N.E.2d 817, 820.) In contradiction to the result reached by my colleagues regarding this issue, I agree with respondents that the summary judgment entered in favor of Maryland Casualty here was improper.

Maryland Casualty's claim that it was entitled to be subrogated to the rights of Berger's estate and recover money from respondents based on theories of money had and received and a constructive trust was based solely on the order of the trial court in the underlying action. In its claim for money had and received, Maryland Casualty stated that the trial court's order required the conservator and the successor conservator, respectively, to pay the estate monies which they had wrongfully transferred from the estate during Berger's in-

competency. To the extent that such repayments were not made, the court's order further provided that the respective sureties were to pay the amounts due. Maryland Casualty alleged that Efron's estate had failed to pay any sums to Berger's estate pursuant to this order; that Maryland Casualty had posted a supersedeas bond in the underlying action; and that if, after exhaustion of all appeals, Maryland Casualty is obligated to pay any monies to Berger's estate, it would become subrogated to the rights of Berger's estate and entitled to seek restitution from respondents for money had and received. In its second subrogation claim, Maryland Casualty realleged the same facts and sought to have a constructive trust imposed upon the funds wrongfully transferred from Berger's estate to respondents.

I believe that Maryland Casualty's pleadings were insufficient to warrant the issuance of summary judgment. The doctrine of subrogation is designed to place the ultimate responsibility for a loss upon the one on whom in good conscience it ought to fall and to reimburse the innocent party who is compelled to pay. (*Housing Development Authority v. M—Z Construction Corp.* (1982), 110 Ill. App. 3d 129, 142, 441 N.E.2d 1179, 1187.) The premise underlying the subrogation doctrine is that one who had indemnified another in pursuance of his obligation to do so is entitled to the means of redress held by the party indemnified against the individual causing the loss. (*Economy Auto Insurance Co. v. Brown* (1948), 334 Ill. App. 579, 588, 79 N.E.2d 854, 858.) However, a surety's right of recovery from a third party through subrogation does not follow as a matter of course upon proof of the fact that the recompensed party could have recovered from the third party. Rather, it must appear that the third party participated in the wrongful act involved or was negligent in regard thereto, because the right to recover from a third party is merely conditional, in contrast to the right to recover from the principal, which is absolute. Moreover, the equities of the surety must be superior to those of the third party in order for the loss to be shifted to the third party. *American Surety Co. v. Morton* (E.D. Ill. 1961), 200 F. Supp. 82, *aff'd* (7th Cir. 1962), 311 F.2d 222.

I believe that Maryland Casualty's allegations were clearly insufficient to demonstrate as a matter of law that it was entitled to be subrogated to the rights of Berger's estate and recover from respondents the monies wrongfully expended from the estate. While the decision in the underlying action established that the conservator, Efron, had wrongfully transferred funds from Berger's estate to respondents, this fact alone does not prove that respondents were involved in the improper transfers or negligent in regard to them. At the time Efron

was appointed conservator, Gloria was still a minor and Deborah was only 21 years old. It was Efron who established the annual pattern of transferring monies from the estate to respondents for the various stated purposes. There was prior court approval for some of the transfers, and the court approved each of the annual accounts, which, with one exception, had been audited, and reflected all of the payouts. Regarding the gifts made to Berger's grandchildren, they, of course, were very young children at the time that the gifts occurred. Under these circumstances, I conclude that there are genuine issues of material fact as to whether the equities here favor respondents or Maryland Casualty. Therefore, I believe that the summary judgment granted Maryland Casualty for its claims for money had and received and for a constructive trust should be reversed, and the cause remanded for further proceedings.

Finally, I address the appeal of Maryland Casualty and Sheila Seidmon, executor of Efron's estate, from the trial court's order denying their motion for conservator's fees. I believe that the trial court erred in denying all conservator's fees. I therefore disagree with the majority's decision that the trial court's finding was not manifestly erroneous.

Pursuant to statute, a conservator is entitled to receive reasonable compensation for his services (see Ill. Rev. Stat. 1977 through 1979, ch. 110½, par. 27–1; Ill. Rev. Stat. 1969 through 1975, ch. 3, par. 336). Such compensation is allowable for services rendered, but not for neglect of duty. (*Nonnast v. The Northern Trust Co.* (1940), 374 Ill. 248, 270, 29 N.E.2d 251, 263.) However, even if a conservator may have wrongfully disbursed money from the estate, he is not automatically barred from being compensated. (See *In re Estate of Sargent* (1934), 276 Ill. App. 312.) In determining reasonable compensation, the court should consider the size of the estate, the work done and the skill with which it was performed, the time required, and the advantages gained or sought by the services. Good faith, diligence, and reasonable prudence should also be considered, as should whether the conservator is guilty of willful misconduct in the administration of the estate. *In re Estate of Rumoro* (1980), 90 Ill. App. 3d 383, 388, 413 N.E.2d 70, 74.

In the present case, the trial court did not state any reasons for denying the petition for fees. It is undisputed that Efron never personally benefitted from his management of Berger's estate. It is also clear that the estate grew substantially during the period that he was administrator. Further, the record reflects that Efron spent considerable amounts of time caring for Berger, his children, and his estate.

While I agree with my colleagues that some of the disbursements made by Efron were improper, I do not believe that they necessarily evidenced neglect of duty or willful misconduct such as would preclude the award of any fees. I therefore conclude that this cause should be remanded for a hearing on fees.

Accordingly, I believe that the appeal involving Berger's objections, No. 83—2875, should be affirmed in part and reversed in part. In appeal No. 84—1502, the summary judgment entered in favor of Maryland Casualty on its claims for subrogation should be reversed, and the cause should be remanded for further proceedings. In appeal No. 84—0204, I would reverse the trial court's order denying the petition for conservator's fees, and I would remand that cause for a hearing.